In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-3501

BEVERLY STEVENSON,

*Plaintiff-Appellant,*

*v.*

HYRE ELECTRIC CO.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 7990—**Virginia M. Kendall**, *Judge.*

ARGUED MAY 21, 2007—DECIDED OCTOBER 16, 2007

Before RIPPLE, WOOD, and EVANS, *Circuit Judges.*

WOOD, *Circuit Judge.* On February 9, 2004, Beverly Stevenson had an extreme emotional and physical response to a stray dog entering her workspace at Hyre Electric Company. She left work soon after and for the most part stayed home for the next several days. The few times she tried to return to work, she felt unable to function and demonstrated erratic and emotional behavior. Her coworkers were so concerned that they eventually locked her out of the building. Then on March 9, 2004, Stevenson was informed by letter that she had been terminated effective February 25.

Stevenson claims that Hyre had notice that she was suffering from a serious health condition and thus vio-

lated her rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, when it fired her. Despite the unprecedented nature of Stevenson's troublesome behavior following the dog incident, Hyre claims it was unaware that she might be suffering from a serious mental health condition. The district court agreed with Hyre and granted its motion for summary judgment. We see some genuine issues of material fact lurking in this case, and we therefore reverse and remand for further proceedings.

# I

We review a district court's decision to grant summary judgment *de novo*, and we construe all facts in the light most favorable to the nonmoving party. *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 631 (7th Cir. 2004). Our account of the facts reflects that perspective.

Prior to February 9, 2004, Stevenson had no documented history of misconduct or health problems at Hyre. All that changed at approximately 10:00 am on February 9, when a stray dog climbed through the window of the Hyre warehouse where Stevenson worked and approached her. She immediately felt physical symptoms, including a headache, a rush of blood to her head, and a tightening of her neck and back. Stevenson's supervisor Mary Cicchetti recounted that immediately after the dog incident, she entered the office area where Stevenson worked and found Stevenson very agitated and "spraying Glade," a room deodorizer. Upon seeing Cicchetti, Stevenson began yelling and cursing, screaming that "f**king animals shouldn't be in the workplace." Cicchetti said that Stevenson was "very intimidating" and belligerent, and that her agitated behavior lasted three or four minutes.

Two hours after the dog incident, Stevenson informed Hay Lee Yuen, the accounting manager, that she was ill and needed to go home. She left and went home immediately; she did not go to a doctor's office or hospital that day. The next morning, Stevenson left a voicemail for Cicchetti and said that she "wasn't feeling well and . . . wouldn't be in today." At that point she went to the hospital for an unrelated medical test.

Hyre's president, Charles Guest, testified in his deposition that he knew the individual employees who work at Hyre and that prior to February 9, Stevenson's behavior had been satisfactory and that he could not recall any verbal or written warnings. On February 11, Stevenson went to her workplace at approximately 7:00 am to speak with Guest. It was an explosive encounter. Guest testified that "[Stevenson] charged into my office yelling and in a very aggressive manner." He continued, "She said it was wrong for her to be subjected to this kind of thing in the office, to have f**king dogs running by her desk and threatening her, and that management needs to do something about this." He tried unsuccessfully to calm her down, but she continued to scream at him. He also assured her that every effort would be made to prevent anything similar from happening in the future. The conversation lasted eight to ten minutes. Guest testified that after the incident, other employees came up to him and made statements such as "What was that all about?" and "Boy, that was something."

The accounting manager, Yuen, overheard part of the February 11 meeting between Stevenson and Guest. She reported that she could not make out the entire conversation but "[Stevenson's] voice was loud and sounded like screaming at the president." She acknowledged that Stevenson sounded "very upset." After the meeting with Guest, Stevenson told Cicchetti that "she could not work" and left the premises.

Later that day, Stevenson filed a complaint with the Occupational Safety and Health Administration regarding stray animals at Hyre's workplace. Stevenson also went to the emergency room. She was examined by a doctor after complaining of three days of headaches, insomnia, anxiety, and loss of appetite following an "emotionally stressful incident at work." An EKG test and CAT scan both came back normal. Stevenson was discharged with a diagnosis of "anxiety and stress" and was prescribed Ativan.

The next day, February 12, Stevenson left a message for Cicchetti stating that she was ill and would not be coming to work. Later that day she met with a union representative, Richard Sipple, to discuss the dog incident. During the meeting, Stevenson mentioned that she was "off sick" but did not elaborate. On Friday, February 13, and Monday, February 16, Stevenson again called in sick but gave no additional details about her condition.

On February 17, Stevenson went to work at 7:00 am. Cicchetti had boxed up the contents of Stevenson's desk and moved them to another room. Cicchetti claimed that she did so to accommodate Stevenson's fear of stray animals. Stevenson stayed at work for a few hours, but she was still agitated, completed little or no work, and ultimately called the police because she believed that she was somehow being harassed. At approximately 10:00 am, she told Cicchetti that she was not feeling well and left work. Before leaving, Stevenson left the hospital's report of her February 11 emergency room visit on Yuen's desk. After Stevenson left, Guest gave Cicchetti permission to change the locks on the doors of Hyre's office. Guest then sent a letter by overnight mail to Stevenson that stated in part:

> You no longer have any accrued vacation or sick leave available. Therefore, any additional leave must

> be governed by Hyre's Family and Medical Leave Policy. Under the provisions of Hyre's Employment Manual, you are required to obtain a medical certification from your physician or other health care provider for a serious health condition FMLA leave. If you do not do so within fifteen (15) days from the commencement of your leave or by Tuesday, February 24, 2004, your absences will be deemed unexcused and you will be terminated from Hyre's employ.

On February 18, Stevenson again called in sick. She went to a doctor's appointment that she had scheduled on February 13 or 14. There she met with Dr. Mary Jo Liszek, her primary care physician, and told Dr. Liszek about her medical concerns. Dr. Liszek prescribed a sleep aid for Stevenson and scheduled a follow-up visit for February 20. Stevenson claims that Dr. Liszek told her to stay home for the next two days.

On February 20, Stevenson again met with union representatives and recounted her story once more. She also gave the representatives the documentation from her ER visit. Then Stevenson went to her follow-up appointment with Dr. Liszek. She was seen first by Dr. Mahan, an associate of Dr. Liszek, to whom she reported that her anxiety, sleeping difficulties, and headaches had improved. She told Dr. Mahan that she wanted to return to work, but that she needed a doctor's note to do so. Dr. Liszek then saw Stevenson briefly and wrote a note excusing her absence from February 9 through February 20. The parties agree that this note does not establish that Stevenson had been instructed by Dr. Liszek not to work for those days.

On Monday, February 23, Stevenson did not return to work. She claims that her union representatives told her that the union did not want her to return. Sipple recalled telling Stevenson that she could not return to work until

she had a "doctor's release." That day, Sipple and another union representative met with Guest and Hyre employee Jim Palm to discuss Stevenson's situation. Also that day, Stevenson faxed to the union a copy of the note from Dr. Liszek; the union passed the note along to Hyre.

The next morning, Stevenson called Cicchetti and said that, in keeping with the union's instructions, she was not coming to work that day. Later, she changed her mind and arrived at Hyre at approximately 10:00 am. She discovered that the locks had been changed, and so she knocked on the door until Guest answered it. Guest refused to accept her note from Dr. Liszek; instead, Guest gave her a box containing her personal belongings "because she wasn't coming back into the office." Later, the union called Guest, and he told them that the note from Dr. Liszek was not sufficient. This information was relayed to Stevenson, and the union advised her to get another doctor's note. Stevenson returned to Dr. Liszek and asked for a note certifying that she could return to work; she did not, however, mention the FMLA specifically. Dr. Liszek obliged with a second note purporting to excuse her through February 24. Stevenson faxed this note to the union that evening with a cover letter explaining that Dr. Liszek was willing to answer questions and complete additional forms if needed. The union then asked Guest in writing to "[k]indly put forth in writing your reasons why this [first] release was not enough and let us know what is needed to return Beverly to work." Guest never responded.

On February 25, the union faxed the second doctor's note to Hyre. It is unclear whether the cover letter from Stevenson was faxed as well. From that point until March 9, Stevenson heard nothing from Hyre and did not contact anyone at Hyre herself. On March 9, Hyre sent a letter to Stevenson stating that she had been terminated effective February 25.

## II

### A

We begin our inquiry with the question whether Stevenson gave Hyre notice of her need for FMLA leave. If she did not, then Hyre had no duty to give her this leave. *Aubuchon v. Knauf Fiberglass*, *GMBH*, 359 F.3d 950, 951 (7th Cir. 2004). Typically, an employee must inform her employer 30 days in advance that she will need FMLA leave. 29 C.F.R. § 825.302. When the need for FMLA leave is not known in advance, however, "an employee should give notice to the employer of the need for FMLA leave as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(a). In such a case, "[i]t is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible." *Id.*

*Aubuchon* explained that the FMLA places the burden of giving notice on the employee as "the quid pro quo for the employer's partial surrender of control over his work force." 359 F.3d at 951. On the other hand, the notice requirement is not demanding:

> The employee's duty is merely to place the employer on notice of a probable basis for FMLA leave. He doesn't have to write a brief demonstrating a legal entitlement. He just has to give the employer enough information to establish probable cause, as it were, to believe that he is entitled to FMLA leave.

*Id.* at 953. Once that is done, then it becomes "the employer's duty to request such additional information from the employee's doctor or some other reputable source as may be necessary to confirm the employee's entitlement." *Id.*

Although the notice requirement is not overly formalized, the notice must succeed in alerting the employer to

the seriousness of the health condition. So, for example, in *Aubuchon* it was not enough for an employee to inform his employer that he needed leave because his wife was pregnant. *Id.* Had the employee added that his wife was having "complications," that "would have sufficed." *Id.* Likewise, "[a] reference to being 'sick'" is insufficient because "not only [did it] withh[o]ld important information from the employer but likely threw it off the scent [because] . . . [c]ertainly it did not suggest to the employer that the medical condition might be serious." *Collins v. NTN-Bower Corp.*, 272 F.3d 1006, 1008-09 (7th Cir. 2001). This is because FMLA leave is available only for a "serious health condition" affecting an employee or one of her family members.

In this case, taking the facts in the light most favorable to Stevenson, it is possible that she herself was unaware that she was suffering from a serious medical condition until she went to the emergency room on February 11. Even though she left work feeling ill on February 9 and called in sick on February 10, she might have thought that the illness would soon lift. Once she went to the emergency room, however, she was given a diagnosis of "anxiety" along with a prescription for anti-anxiety medication, Ativan. At this point, her obligations under 29 C.F.R. § 825.303 were triggered. Yet Stevenson did not give Hyre any explicit notice of her need for leave within one or two working days of February 11 (which was a Wednesday). Instead, she again called in sick on February 12, February 13, and (Monday) February 16. Each time, she said only that she was "ill" and "wouldn't be in today." It was not until February 17 that she left a copy of her ER discharge with someone at Hyre (assuming for now that this might have been adequate notice).

We can find no meaningful difference between the facts of this case and those of *Aubuchon*, discussed above. Just as the plaintiff in *Aubuchon* had an obligation to tell his

employer that his wife was having pregnancy complications in order to make his employer aware that he needed FMLA leave, Stevenson had an obligation to tell Hyre something more than that she was out sick for a day—something that might have been explained by a mundane 24-hour upset stomach. See *Burnett v. LFW Inc.*, 472 F.3d 471, 479 (7th Cir. 2006) (holding that calling in sick while providing no additional information is insufficient for the FMLA).

Stevenson contends that Hyre's letter to Stevenson on February 17 "constitutes an admission that it was aware of an 'alleged illness' and was therefore taking the next logical step of requesting some kind of certification," but we do not see it this way. First, the letter came after the two-day time period in which Stevenson should have given Hyre notice of her need for FMLA leave. 29 C.F.R. § 825.303(a). Second, if notice could be presumed whenever an employer asks an employee if she needs FMLA leave, then the FMLA notice requirement would be rendered meaningless. Stevenson does not make the argument that Hyre's insistence that she provide certification demonstrates that Hyre recognized her need for FMLA leave, and so we do not consider that interpretation of Hyre's actions. At best, Hyre's letter gave Stevenson more time to give notice than the statute does, but it still required that documentation be provided within 15 days of the onset of her leave. Therefore, although Stevenson did tell Hyre that she was missing work because of illness, she did not, within the period required by 29 C.F.R. § 825.303(a), verbally or in writing make Hyre aware that her illness might trigger its FMLA responsibilities.

## B

Direct notice from the employee to the employer is not, however, always necessary. Stevenson's case may go

forward if Hyre had constructive notice of her need for FMLA leave. In *Byrne v. Avon Products*, 328 F.3d 379 (7th Cir. 2003), this court held that either an employee's inability to communicate his illness to his employer or clear abnormalities in the employee's behavior may constitute constructive notice of a serious health condition. *Id.* at 381-82. "It is enough under the FMLA if the employer knows of the employee's need for leave; the employee need not mention the statute or demand its benefits." *Id.* at 382.

In *Byrne*, we found such notice when an employee with four years of highly regarded service started to sleep on the job for time periods approaching half of his shift. The employer also learned from a family member that the employee was "very sick." When a company representative finally contacted him directly, the employee could only mumble several odd phrases. The day after speaking to the employee's sister, the company learned that he had been hospitalized. Under these circumstances, the court in *Byrne* concluded that "unusual behavior" alone can be "enough to notify a reasonable employer that [an employee] suffered from a serious health condition." *Id.* at 382-83.

In Stevenson's case, the district court appears to have merged the two allowable means of constructive notice (inability to communicate and clear abnormalities). It must have thought that Stevenson had to satisfy both, since it concluded that the *Byrne* exception could not apply because "Stevenson . . . maintained an ability to relate her symptoms and feelings at length." *Byrne*, however, held that "[a] sudden change may supply notice even if the employee is lucid," giving the example of an employer seeing an employee break her arm and concluding that this observation would give the employer sufficient notice of a need for FMLA leave without the employee's

saying a word. 328 F.3d at 381-82. The district court therefore erred as a matter of law by not considering Stevenson's claims of unusual behavior as constructive notice regardless of her ability to communicate.

If the record shows that there are disputed issues of material fact, once we apply the correct legal standard, the summary judgment for Hyre must be reversed. In Stevenson's case, only one of the two approaches recognized in *Byrne* applies—clear abnormalities—as she does not claim an inability to communicate. Taking the facts in the light most favorable to Stevenson, we conclude that a trier of fact could find that her behavior was so bizarre that it amounted to constructive notice of the need for leave. Hyre has not disputed Stevenson's claim that she was a "model employee" prior to February 9, 2004. Her behavior changed dramatically immediately after the dog incident on February 9, as the testimony of Cicchetti, Guest, and Yuen bears out.

Cicchetti also testified about Stevenson's behavior on February 17, when she returned to the office and attempted to work. Cicchetti testified that "I tried to explain to her that we moved her desk so she could close the door, and she started yelling again," and that Stevenson responded "I don't want to sit in there. I can't breathe in there," and then she called the police. Stevenson testified about her agitated state during all three of these encounters. Guest, the company president, acknowledged that they thought the problem was severe enough to warrant changing the locks—as he put it, "[w]e were concerned about Beverly coming into the workplace." He testified further, "I was concerned about having a very angry employee," and said that this concern was based solely on the incidents that took place between February 9 and 17.

On this record, a trier of fact could conclude that Stevenson's behavior on February 9, 11, and 17 was so

unusual that it gave Hyre constructive notice of her need for FMLA leave. Lengthy encounters of yelling and swearing at one's superiors so severe that a company locks out an employee with a previously unblemished record for safety concerns, coupled with that employee's calling the police because her belongings have been moved to another desk, are undeniably unusual and could be viewed by a trier of fact as unusual enough to give Hyre notice of a serious mental health condition. Of course, the factfinder could find that Stevenson just had a bad temper that erupted during the period in question. The point here is that this is not a decision the court can make as a matter of law. (We also note that Hyre insists on characterizing the February 9 dog incident as involving "a stray puppy," which would serve only to make Stevenson's subsequent responses to the incident more unusual than if the incident had involved a large, menacing dog. The record does not otherwise reveal the size or breed of the dog.) For these reasons, summary judgment for Hyre based on Stevenson's alleged lack of notice of her need for FMLA leave was inappropriate.

## III

Providing notice is not enough to receive FMLA benefits. An employee must also have (in the "self" branch of the statute under which Stevenson is proceeding) a serious health condition. *Haefling v. UPS*, 169 F.3d 494, 498 (7th Cir. 1999). The FMLA itself defines a "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). The FMLA regulations further define "serious health condition," stating in relevant part that a "serious health condition must involve:

Continuing treatment by a health care provider. A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:

(i) A period of incapacity (i.e., inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:

(A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

(B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

29 C.F.R. § 825.114(a)(2). Thus, under this section of the regulations, an employee must show by a preponderance of the evidence that she was incapacitated for "more than three consecutive calendar days," meaning that she either could not work for those days or could not perform regular daily activities, and that she received ongoing treatment for her condition by a medical professional, either in the form of multiple doctor's visits or continuing medication.

Stevenson easily satisfies the medical treatment requirement, as she had an emergency room visit on February 11 and two visits to her doctor, Dr. Liszek, on February 18 and February 20. Her ongoing prescriptions, given to her by the emergency room doctor and Dr. Liszek, could be

seen as "a regimen of continuing treatment," meaning Stevenson might only need to show one doctor's visit.

The district court concluded, however, that Stevenson had failed to present evidence that would show that she was incapacitated. She needed something indicating either an inability (1) to work, (2) attend school or (3) perform other regular daily activities as a result of her serious health condition. 29 C.F.R. § 825.114(a)(2)(i). The "school" option does not apply to her, and so we set it aside. Because Stevenson left work early on Monday, February 9, 2004, and was scheduled to work the remaining days of that week, in order to qualify under "inability to work," she would need to show that she was unable to work on February 10, 11, and 12 as well, or for any time period of more than three days prior to February 20, when she began feeling better. To qualify under the "other daily activities" option, she would need to show that she was unable to perform regular daily activities on more than three consecutive days in that same period. 29 C.F.R. § 825.114(a)(2)(i).

We agree with the district court that Stevenson failed to create a genuine issue of fact under the third option provided by the regulations, her ability to perform regular daily activities. The record reflects that Stevenson engaged in a variety of activities during the period at issue. She visited work on February 11, phoned in a complaint about the dogs to OSHA that afternoon, attended a meeting at her union's offices on February 12 about the incident, returned to work again on February 17, had another meeting at the union offices on February 20, and tried to begin working again on February 24 but was turned away. This means that she must show that she can meet the first option by showing her inability to work.

The district court pointed out that the notes from Dr. Liszek "were not intended to suggest that Plaintiff had

an FMLA-qualifying condition." But the fact that the doctor's statement might have said more about incapacity does not transform it into a "'negative certification,' that is, an affirmative statement by [the plaintiff's doctor] that [the plaintiff]'s incapacity lasted less than three days." *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 886 (7th Cir. 2005). In *Kauffman*, the medical record at issue appeared to state clearly that the plaintiff was incapacitated; here, in contrast, the written records are inconclusive.

In Stevenson's favor, Dr. Liszek testified in her deposition that Stevenson suffered from a "serious medical condition." Hyre argues that "serious health condition" is a "term of art," and therefore Dr. Liszek's testimony about a "serious medical condition" is insufficient for FMLA purposes. This argument is a bit ridiculous, especially given the context of the statement. Dr. Liszek said, "Yes, they [the forms she filled out for Stevenson] were not FMLA. [Stevenson] did have a serious medical condition, but it was not—it was not—the form I filled out was not an FMLA form." Drawing inferences from this testimony in the light most favorable to Stevenson, as we must at this stage, Dr. Liszek was saying she could have filled out an FMLA form for Stevenson because Stevenson had a qualifying medical condition, but that she had not been asked to fill out a form that had "FMLA" printed at the top.

Even if we thought that Dr. Liszek's opinion that Stevenson had a qualifying condition was too conclusory to create a triable issue of fact by itself, see *Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 952 (7th Cir. 2000) (an ADA case, not an FMLA case), there is more here. Dr. Liszek testified that the Ativan dosage that had been prescribed for Stevenson at the ER was a "medium dose," not a light dose. After the ER visit, Dr. Liszek prescribed additional medication for Stevenson. Dr. Liszek

testified that Stevenson's pulse on February 11, according to the ER documents, was "high for her." She noted that Stevenson complained at her February 18 appointment that she had a headache that dated back to the February 9 incident. Dr. Liszek said that on February 18, "my final evaluation of her was that she had anxiety," which matches the ER diagnosis on February 11.

As for Stevenson's ability to return to work, Dr. Liszek stated that on February 20, "[Stevenson's] medical conditions were more stable." The doctor did not say one way or the other whether Stevenson could have worked during the time she stayed home from work. Dr. Liszek testified, however, that she did not just blindly fill out the work excuse form, but "would make my judgment based on, you know, her illness that I was seeing in the clinic and her history of the ER visit." In that context, she noted that Stevenson presented with anxiety and insomnia, as well as ongoing anemia and hypertension. Hyre claims "Dr. Liszek did not attach any time period" for the medical conditions she described, but that is not quite right. Dr. Liszek stated definitively that "[Stevenson] had anxiety *at the point when I was seeing her*." (Emphasis added.) This was not an opinion only about Stevenson's previous maladies, as Hyre suggests. Thus, Stevenson's testimony about the effect of her health condition on her ability to work does not exist in a vacuum; it is reinforced by medical records, prescription records, and her doctor's testimony.

Hyre points to the FMLA regulations that state that "[a]n employee is 'unable to perform the functions of the position' where the health care provider finds that the employee is unable to work at all or is unable to perform any one of the essential functions of the employee's position within the meaning of the Americans with Disabilities Act." 29 C.F.R. § 825.115. This regulation, however, deals with what a medical provider needs to write

down in a certification, not with the underlying definition of "serious health condition." It does not say that the lack of such a written certification is conclusive evidence that there is no qualifying medical condition or that there is no other way to prove this point. We conclude, on this record, that a material issue of fact exists on the question whether Stevenson did have a "serious health condition." It was therefore error to grant summary judgment in Hyre's favor.

## IV

Stevenson also appeals the denial of her own motion for summary judgment, claiming that Hyre violated the FMLA by failing to allow her to cure deficiencies in the certification of her serious health condition, failing to allow her the minimum 15 days it promised to provide that certification, failing to inform her of her FMLA rights, and failing to answer questions concerning her FMLA rights responsively. The district court rejected these claims based on its conclusion that Stevenson failed to give Hyre adequate notice. We have concluded only that there are genuine issues of fact on the notice question, not that the record establishes as a matter of law that notice was proper. It would therefore be inappropriate for us to find that Stevenson is entitled to judgment as a matter of law, with this critical question still contested. We note, however, that we agree with the district court that Stevenson failed to give Hyre notice in her complaint of her contention that it failed properly to inform her of her FMLA rights. The district court thus acted within its discretion when it refused to allow her to raise that argument for the first time in her summary judgment motion.

**V**

Although Stevenson has not demonstrated the absence of disputed issues of material fact and an entitlement to judgment as a matter of law, she has presented enough to survive Hyre's summary judgment motion on all but one theory. We therefore AFFIRM the district court's dismissal of Stevenson's claim that Hyre did not inform her of her FMLA rights, but we REVERSE the district court's grant of summary judgment for Hyre and REMAND this case to the district court for further proceedings on the remaining claims. Costs on appeal are to be taxed against Hyre.

EVANS, *Circuit Judge*, dissenting. Because I am convinced that there are no genuine issues of material fact in this case, I would affirm the grant of summary judgment that Judge Kendall awarded to Hyre.

It is, of course, well-understood that in determining whether a genuine issue of fact exists, courts must view the evidence and draw all reasonable inferences in favor of the party opposing the motion, in this case Stevenson. I part company with the majority, however, as to whether—by any stretch of the imagination—Stevenson is entitled to the inferences being granted to her.

The majority concedes that Stevenson did not properly provide her employer with direct notice of her need for FMLA leave. But the majority then proceeds to find that the employer had constructive notice of Stevenson's need for leave, based on an exception to the direct notice

requirement set out in *Byrne v. Avon Products*, 328 F.3d 379 (7th Cir. 2003). I cannot see how the evidence presented allows any conceivable inferences that bring Stevenson's case within shouting distance of *Byrne*.

We said in *Byrne* that sometimes unusual behavior gives all the notice that is required to inform an employer that an employee needs leave. The *Byrne* case is, in fact, so dramatic that almost no other conclusion would have been possible. Byrne, who had previously been a model employee, began to fall asleep on the job and failed to show up for work. When his employer telephoned him, his sister said he was "very sick." In fact, suffering from depression, Byrne himself could not speak beyond "mumbling several odd phrases." His relatives took him to a hospital—after talking him out of a room in which he had barricaded himself. He began to hallucinate, attempted suicide, and during a panic attack tried to "flush his head down a toilet." To say that Stevenson's behavior was comparably unusual to Byrne's would be to let the exception swallow the rule. I believe that as a matter of law, the "*Byrne* exception" is not applicable, as, by the way, we found it not to be applicable in *Burnett v. LFW, Inc.*, 472 F.3d 471 (7th Cir. 2006).

Although the problem with notice should be considered dispositive, I am also troubled by the majority's conclusion that Stevenson has raised a factual dispute as to her serious health condition. Stevenson shows that she visited doctors during the relevant period. One of the visits, however, was for an unrelated medical test. A second was to an emergency room where she complained about a stressful incident at work—presumably the unwelcome appearance of the dog. The doctors performed an EKG and a CAT scan, both of which were normal. She was diagnosed with anxiety and prescribed medication to calm her nerves. Anxiety comes in all degrees, however, and Stevenson does not provide information as

to how her anxiety level prevented her from working. She also visited her own doctor, who later wrote an excuse for missed work but who never told Stevenson that her condition required her to stay away from her job. During this time, Stevenson was able to meet with a union representative and showed up at Hyre for short periods of time. It is, of course, possible that Stevenson was suffering from a qualifying health condition, but my point here is that she provides no evidence which would prevent summary judgment on the issue. It is not too much to expect her to do that.

Stevenson, who bears the ultimate burden of proof in this case, was obligated at the summary judgment stage to come "forward with properly supported arguments or evidence to show the existence of a genuine issue of material fact." *Treadwell v. Office of Ill. Secretary of State*, 455 F.3d 778, 781 (7th Cir. 2006). This she has utterly failed to do.

For these reasons, I respectfully dissent.

A true Copy:

       Teste:

 

                _____
                *Clerk of the United States Court of*
                *Appeals for the Seventh Circuit*