In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-1775

ROBERT RIGHI,

*Plaintiff-Appellant,*

*v.*

SMC CORPORATION OF AMERICA,
a corporation, and LOUIS KING,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 1:07-cv-1064—**Joe Billy McDade**, *Judge.*

ARGUED SEPTEMBER 23, 2009—DECIDED FEBRUARY 14, 2011

Before FLAUM, WOOD, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Robert Righi was employed as a sales representative for SMC Corporation in the company's Aurora, Illinois office. While at a mandatory training seminar in Indianapolis, he learned that his elderly mother was experiencing a medical emergency. He left the seminar and returned to Illinois to assess his mother's situation. The next day, he e-mailed his

supervisor to explain that he needed "the next couple days off" to make arrangements for his mother's care; he said in his e-mail that he had vacation time available or "could apply for the family care act, which I do not want to do at this time." Righi's supervisor then tried for more than a week to reach him by telephone to clarify his request for leave. Righi did not return these calls or otherwise contact his employer. When he finally returned to work nine days after leaving the training session, he was fired for violating SMC's leave policy.

Righi sued SMC and his supervisor alleging violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.* The district court entered summary judgment for the defendants on two separate grounds: (1) Righi was not entitled to FMLA protection because his e-mail specifically disavowed any intent to use FMLA leave; and (2) even assuming Righi's e-mail invoked the FMLA, he failed to notify SMC of his anticipated return-to-work date—as required by company policy and applicable FMLA regulations—and he ignored his supervisor's repeated phone calls seeking more information about his leave request.

We affirm, though on the latter ground only. Righi's e-mail, read in his favor, allows an inference that he was leaving at least *some* room to change his mind and use FMLA leave rather than vacation time to cover his absence. But the FMLA's regulations place the burden on the employee to notify his employer of the anticipated duration of unforeseeable leave "as soon as practicable," which under the regulations then in effect meant "no

more than one or two working days of learning of the need for leave." 29 C.F.R. §§ 825.302(b) and (c), 825.303(a) (2007). Moreover, an employer is entitled to enforce compliance with its "usual and customary notice and procedural requirements" regarding FMLA leave. *Id.* § 825.302(d) (2007). Because Righi failed to comply with the applicable regulatory and workplace requirements for family leave, his termination did not violate the FMLA.

## I. Background

Robert Righi was employed as a sales representative for SMC from 2004 until July 20, 2006, when he was fired for violating the company's leave policy.[1] Throughout his employment, Righi was assigned to SMC's Aurora office but was permitted to work primarily out of his home in Henry, Illinois, where he lived with his elderly mother, Ann Righi, and his roommate Chuck Purtscher. Ann Righi was an insulin-dependent diabetic suffering from a heart condition and was often in need of medical attention.

Although Righi usually worked from home, he was expected to work 40 to 50 hours per week and to check in with his sales manager Louis King on a daily basis.[2] Righi and King typically communicated via Righi's company-issued cell phone or by e-mail. Occasionally, when King

---

[1] SMC manufactures pneumatic automation products and has offices throughout the United States.

[2] Righi also attended biweekly meetings at SMC's Aurora office.

could not reach Righi on his cell phone, King would contact Righi on his home telephone or on the cell phone belonging to Purtscher.

On several prior occasions, Righi needed vacation time in order to care for his mother. He often e-mailed King to request this leave. SMC policy required employees to obtain prior approval from a supervisor before taking leave. SMC's attendance policy also stated that a "[f]ailure to report for work for two (2) consecutive days without notifying your supervisor" is grounds for termination.[3] On these prior occasions, Righi complied with company policy whenever he needed leave.

From July 9, 2006, to July 21, 2006, Righi was scheduled to attend a mandatory two-week training session in Indianapolis. On Tuesday morning, July 11, while at the seminar, Righi received an urgent phone call from his sister, who informed him that their mother had gone into a diabetic coma. Righi decided to return home. He told a co-worker he was leaving to attend to a family emergency and asked the co-worker to pass this information to others at the training session. He then embarked on the four-hour drive to his home in Illinois. By the time Righi arrived, his mother's condition had stabilized.

Righi did not contact King, his supervisor, at any time on July 11 to inform him about the situation. Meanwhile,

---

[3] This policy was contained within a memorandum entitled "Corrective Action Process." On January 8, 2006, Righi signed a separate memo acknowledging his receipt and understanding of the Corrective Action Process.

King—apparently unaware that Righi had left the training session—called Righi's company-issued cell phone three times on July 11, 2006, to discuss business matters. But Righi had turned his phone off and therefore did not answer these calls. King called again the next morning, July 12, at 6:45 a.m. and once again received no response.

At approximately 9 a.m. on July 12, Righi sent an e-mail to King. He apologized for not contacting King earlier and explained that he left the training session to attend to his mother, who took an incorrect dosage of insulin and slipped into a coma. Righi then stated:

> I need the next couple days off to make arrangements in an intermediate care facility for my Mother. . . . *I do have the vacation time, or I could apply for the family care act, which I do not want to do at this time.*
>
> I hope you can understand my situation and approve this emergency time off. I will be very busy the next couple of days . . . so I might be slow getting back to you.[4]

(Emphasis added.) Righi did not return to work until July 20, 2006, nine days after leaving the training session.

---

[4] Despite the contents of this e-mail, however, it is undisputed that Righi's mother did not visit an emergency room, a physician, or a health-care provider at any time during the two-week period beginning July 11, 2006. Righi claims that during this time he was attempting to make arrangements to move his mother to an intermediate care facility.

This e-mail was Righi's only contact with King until July 19, 2006.

Righi also sent an e-mail to Kenta Joki, a co-worker, on the morning of July 12. Joki was in charge of scheduling the training classes in Indianapolis. Righi told Joki that his mom was in poor health and that he would have to reschedule the class. This e-mail was Righi's last communication with anyone at SMC until July 19, 2006.

When King received Righi's July 12 e-mail, he repeatedly attempted to contact Righi by phone to inquire further about his leave. King called Righi's company cell phone four times on Wednesday, July 12; twice on Thursday, July 13; four times on Friday, July 14; twice on Monday, July 17; and once on Tuesday, July 18. Righi apparently kept his cell phone turned off during this period, and he did not answer or return any of King's phone calls or messages. King also attempted to reach Righi on his home phone. On the evening of July 17, King called Righi's home phone and spoke to Purtscher, telling him that Righi needed to "wrap this up."[5] Purtscher promptly relayed this message to Righi, but still Righi did

[5] SMC also contends that on July 17 King explicitly instructed Purtscher to have Righi call King. Righi denies this. Although the parties dispute this fact, it is not material to our analysis. As we explain, *infra*, to qualify for FMLA protection, it was Righi's responsibility to contact King and keep him apprised about the duration of his leave. *See* 29 C.F.R. § 825.302(c). Righi failed to do so. This regulatory requirement was never excused by SMC, and it therefore remained regardless of whether King expressly told Purtscher to have Righi call.

not call King back. Two days later, on July 19, King called Righi's cell phone again and Purtscher answered. King asked Purtscher to tell Righi that he needed to contact King as soon as possible. Later that day, after nine days of silence, Righi finally called King. King told Righi to come to the office for a meeting the next day. At that meeting Righi was fired for violating SMC's leave policy.

Righi sued SMC and King alleging FMLA violations. Righi brought two claims—one for interference with his right to FMLA leave and the other for discrimination or retaliation for attempting to exercise FMLA rights. The district court granted the defendants' motion for summary judgment and dismissed both of Righi's claims. On appeal Righi challenges only the dismissal of his FMLA interference claim.

## II. Discussion

We review a district court's grant of summary judgment de novo, construing all facts and drawing reasonable inferences in the light most favorable to the nonmoving party. *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 760 (7th Cir. 2008). Summary judgment is appropriate when there is no material dispute of fact and the moving party is entitled to judgment as a matter of law. *Id.* Here, the question is whether Righi could prevail on a claim for FMLA interference based on the facts we have recounted.

The FMLA permits an eligible employee to take up to 12 weeks of leave per year in order to "care for . . . [a]

parent [with] a serious health condition." 29 U.S.C.
§ 2612(a)(1)(C). The Act further provides that employers
may not "interfere with, restrain, or deny the exercise of
or the attempt to exercise, any right provided under
[the Act]." *Id.* § 2615(a)(1). To prevail on a claim for
FMLA interference, the employee must prove that: (1) he
was eligible for FMLA protections; (2) his employer
was covered by the FMLA; (3) he was entitled to leave
under the FMLA; (4) he provided sufficient notice of his
intent to take FMLA leave; and (5) his employer denied
him FMLA benefits to which he was entitled. *Brown v.
Auto. Components Holdings, LLC,* 622 F.3d 685, 689 (7th
Cir. 2010); *Ridings*, 537 F.3d at 761.

The first three elements of the claim are not seriously
in dispute; this appeal turns on whether Righi provided
SMC with sufficient notice under the FMLA and its
regulations.[6] When the employee fails to give his
employer proper notice, the employer is under no duty
to provide FMLA leave. *See Stevenson v. Hyre Elec. Co.*,
505 F.3d 720, 724 (7th Cir. 2007); *Aubuchon v. Knauf Fiber-
glass, GMBH*, 359 F.3d 950, 951 (7th Cir. 2004). Stated
differently, an employee's failure to comply with the

---

[6] SMC maintains that Righi was not entitled to FMLA leave
because his mother did not suffer from a "serious health
condition" as that phrase is defined by the Act and because
Righi failed to complete the required medical certification
forms. *See* 29 U.S.C. §§ 2611(11) (defining "serious health
condition"), 2613 (discussing certification). Because Righi's
claim fails for lack of sufficient notice regarding the duration
of his leave, we need not address these arguments.

notice requirements of the FMLA and its regulations "forecloses . . . an FMLA interference claim because [the employee] did not fulfill her obligations in order to be protected." *Ridings*, 537 F.3d at 771.

The Department of Labor has issued detailed regulations governing the notice requirement. *See* 29 C.F.R. §§ 825.300 *et seq.* (2007). The regulations were most recently amended in 2009; we apply the version in effect as of July 2006—when these events occurred—to inform our analysis. *See Brown*, 622 F.3d at 690 (applying contemporaneous regulations); *Haefling v. United Parcel Serv., Inc.*, 169 F.3d 494, 498 (7th Cir. 1999) (same).

The district court held as an initial matter that Righi did not provide sufficient notice to properly invoke the protections of the FMLA. Generally speaking, it does not take much for an employee to invoke his FMLA rights; he must simply provide enough information "to place the employer on notice of a probable basis for FMLA leave." *Aubuchon*, 359 F.3d at 953; *see also Stevenson*, 505 F.3d at 724-25. The applicable regulations make clear that an employee "need not expressly assert rights under the FMLA or even mention the FMLA" in order to invoke his rights; he need only note that leave is requested for some reason covered by the FMLA. 29 C.F.R. § 825.303(b); *see also Aubuchon*, 359 F.3d at 953 (the employee must provide enough information to establish "probable cause" to believe the employee may qualify for FMLA leave).

Ordinarily, an employee's statement to his employer indicating that he needs leave to care for a seriously ill

parent would be sufficient to invoke the protections of the FMLA. *Cf. Ridings*, 537 F.3d at 762-63, 766 (FMLA rights invoked where employer was aware that employee had a serious health condition even though the employee did not explicitly request FMLA leave). That said, our caselaw also suggests that an employee may waive his FMLA rights if he clearly expresses to his employer that he does not wish to use the protections of the FMLA. *See id.* (indicating that an employee may decline to invoke the protections of the FMLA).

Based on this principle, the district court held that Righi unequivocally declined to invoke FMLA leave and therefore could not prevail on his FMLA interference claim. This holding flowed from the district court's interpretation of the e-mail Righi sent to King on July 12. In that e-mail Righi explained his mother's medical emergency and said he needed to take "the next couple days off" to arrange for an intermediate care facility for his mother. He then stated: "I do have the vacation time, or I could apply for the family care act, which I do not want to do at this time." The district court held that this last statement manifested an explicit waiver of FMLA rights.

We disagree. Read in the light most favorable to Righi, the e-mail leaves open the *possibility* that Righi might want to use FMLA leave after all; this makes it equivocal or at least ambiguous, and therefore sufficient to alert SMC to the potential that Righi would need FMLA leave. The e-mail specifically mentioned his mother's diabetic coma, suggesting that Righi may qualify for

FMLA leave. *See Stevenson*, 505 F.3d at 725 (sufficient notice requires employee to alert employer that a relative's health condition is serious). Righi also said he was aware that he could apply for the "family care act," a clear reference to the FMLA. Although he mentioned he had vacation time available and did not want to apply for family leave "at this time," the qualifying phrase "at this time" could be read to imply that Righi might change his mind and opt to exercise his FMLA rights. Because Righi's e-mail contained this qualifier, it was not an unequivocal waiver of FMLA leave.

Once an employee invokes his FMLA rights by alerting his employer to his need for potentially qualifying leave, the regulations shift the burden to the employer to take certain affirmative steps to process the leave request. 29 C.F.R. § 825.301. In particular, after notice is given, the employer has a duty to provide a written ex-planation of the employee's rights and responsibilities under the FMLA, *id.*, and a duty to make further inquiry if additional information is needed before the employer can process the leave request, *see id.* §§ 825.302(c) ("[T]he employer should inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought . . . . "), 825.303(b) ('The employer will be expected to obtain any additional required information through informal means."). Righi's e-mail—while too ambiguous to trigger SMC's affirmative duty to provide written FMLA mate-rials and accompanying medical certification forms, *see id.* § 825.305—was sufficient to give rise to the em-

ployer's duty to make further inquiry.[7] As we will explain, in this situation, the regulations contemplate that SMC would use informal means to gather more information from Righi regarding his intent to take FMLA leave.

There is no dispute that SMC attempted to fulfill its regulatory obligation to inquire further. As soon as King received Righi's e-mail, King called Righi many times in an effort to learn more about the situation. Righi had apparently turned his cell phone off and did not respond to the 15 phone calls that King placed from July 12 to July 18. Righi did not call King until July 19, and this occurred only after King spoke to Righi's room-mate and told him that Righi needed to call him as soon as possible.

Righi's failure to respond to these calls or otherwise contact his employer dooms his FMLA claim. The FMLA does not authorize employees to "keep their employers in the dark about when they will return" from leave. *Gilliam v. United Parcel Serv., Inc.*, 233 F.3d 969, 971 (7th Cir. 2000). Indeed, employers are "entitled to the sort of notice that will inform them not only that the FMLA

---

[7] In the alternative, Righi argues that his e-mail to King should be read in light of the e-mail he sent to SMC's scheduling coordinator Joki. In that e-mail Righi explained he would have to reschedule his training because he needed to care for his sick mother. Because we have concluded that Righi's e-mail to King did not unequivocally waive his FMLA rights, we need not consider this argument.

may apply *but also when a given employee will return to work.*" *Collins v. NTN-Bower Corp.*, 272 F.3d 1006, 1008 (7th Cir. 2001) (emphasis added). This principle derives from the applicable regulatory scheme, which imposes certain duties on employees requesting FMLA leave. In all cases, the employee must give his employer notice about the "anticipated timing and duration of the leave." 29 C.F.R. § 825.302(c). This requirement also applies where, as here, the need for leave is unforeseeable. *See id.* and 29 C.F.R. § 825.303(a) (specifying notice requirements where need for leave is unforeseeable); *Collins*, 272 F.3d at 1008 (explaining that even in situations where FMLA leave is unforeseeable, the employee's notice must conform with the substantive requirements of 29 C.F.R. § 825.302(c)). In cases (like this one) involving unforeseeable leave, the employee must provide notice to his employer about the anticipated duration of his leave "as soon as practicable." 29 C.F.R. § 825.303(a). Under the regulations in effect at the time of the events in this case, "as soon as practicable" meant "within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible." *Id.* An employee who fails to comply with this notice requirement is not entitled to FMLA protection. *See Brown*, 622 F.3d at 689-90.

Righi's July 12 e-mail told King that he needed "the next couple days off" to attend to his mother, but then Righi fell silent for a full week, ignoring King's many follow-up phone calls. Righi never gave his employer notice of the timing and duration of his requested leave

beyond the ambiguous "next couple days" reference, which he exceeded in any event. Righi was absent without permission from July 11 to July 20, a nine-day period that included six work days; his vague reference to needing "the next couple days" cannot be considered adequate notice of a request for FMLA leave of this more substantial duration. This is especially so in light of King's persistent efforts to reach Righi to clarify his request, which were essentially ignored. It is true that the regulations contemplate relaxing the notice requirement in "extraordinary circumstances," 29 C.F.R. § 825.303(a), but Righi has not identified anything about his circumstances that qualifies as "extraordinary."

Of course when the need for leave is unforeseeable, the employee will sometimes not know exactly how much leave he will need. But the employee must at least communicate *this fact* to the employer, together with an estimate of the likely duration of the requested leave. Here, Righi made no effort whatsoever to keep SMC apprised of his fluid situation and was absent and out of touch with his supervisor for more than a week. It is undisputed that by the time Righi arrived home on July 11, his mother's condition had stabilized; once the emergency abated, it was entirely practicable for Righi to call King to provide the required notice of when he expected to return.

Righi argues that he innocently believed that his absence was excused. He notes that he often kept his cell phone turned off, and when he could not be reached via cell phone, King would sometimes call

Righi's home phone. Righi contends that because King had a "usual and customary practice" of calling his home phone on these prior occasions, King's duty to make further inquiry included a duty to call Righi's home phone. Righi claims that because King did not call his home phone until July 17, he was entitled to assume his leave was excused.

This argument is easily dismissed. First, it is undisputed that even after King called Righi's home phone for the first time on July 17, Righi *still* did not return the call. He did not return his supervisor's call until two days later on July 19, and this was only after King called *again* and left another message with Purtscher. Regardless, the argument has no support in the applicable regulations. Instead, when an employee is unclear about whether he wants FMLA leave or not, the regulations contemplate that the employer will make further inquiry and will "obtain any additional required information through informal means." *Id.* § 825.303(b). We think this means only that the employer must make a reasonable effort to clarify the employee's leave request. Here, King's concerted effort for more than a week to reach Righi by cell phone certainly qualifies as reasonable.

Finally, it bears repeating that the regulations explicitly provide that employers may require their employees to comply with their "usual and customary notice and procedural requirements" when requesting FMLA leave. *Id.* § 825.302(d). SMC had a written policy requiring its employees to obtain approval for leave from their

supervisors. SMC's attendance policy also stated that an unapproved absence of two consecutive days or more was grounds for termination. We have previously held that an employee's failure to comply with his employer's internal leave policies and procedures is a sufficient ground for termination and forecloses an FMLA claim. *Brown*, 622 F.3d at 689-90; *Ridings*, 537 F.3d at 769 n.3, 771; *Lewis v. Holsum of Fort Wayne, Inc.*, 278 F.3d 706, 710 (7th Cir. 2002); *Gilliam*, 233 F.3d at 971. Righi never obtained King's approval for his leave, and his unapproved absence persisted for far longer than the two days contemplated by the regulations. Of course, an employer cannot deny FMLA leave when an employee has a legal entitlement to it. But Righi's failure to follow the applicable regulatory and workplace requirements for notifying his employer of the expected duration of his leave forecloses his FMLA interference claim.

AFFIRMED.