In the
United States Court of Appeals
For the Seventh Circuit

No. 99-1331

James Hunt, et al.,

Plaintiffs-Appellants,

v.

City of Markham, Illinois,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 5620--Charles P. Kocoras, Judge.

Argued April 6, 2000--Decided July 11, 2000

 Before Posner, Chief Judge, and Flaum and Ripple,
Circuit Judges.

 Posner, Chief Judge.  Four white police officers
sued the City of Markham, a Chicago suburb,
charging racial and age discrimination in
violation of 42 U.S.C. sec. 1981 and the Age
Discrimination in Employment Act, respectively,
and they now appeal from the grant of summary
judgment for the defendant and the resulting
dismissal of their suit. Unlike most "reverse
discrimination" suits, this one does not arise
out of efforts to redress historic injustices or
mitigate racial tensions; it charges naked
discrimination by a municipal government that is
controlled by blacks, who are a majority of the
local population. The mayor is black, as is a
majority of the city council, over which he
presides, and as are all the members of the board
of fire and police commissioners, whom he
appoints.

 Construed as favorably to the plaintiffs as the
record permits, which is the proper standard when
evaluating the grant of summary judgment in favor
of the defendant, the facts are as follows.
During a period stretching from 1993 to sometime
after this suit was filed in 1997, the mayor and
other black officials made repeated racist and
"ageist" comments to or about the plaintiffs,
such as that the city needed "to get rid of all
the old white police officers" and--to one of the

plaintiffs--"when are you going to quit so we can bring these young black men up?"; "it is the blacks' turn to self-govern in Markham, and if you are white, get out"; "it is our turn; you are the minority now; you lost, you might as well move out; we don't owe you nothing." Once when the mayor said at a city council meeting, "they are not worth anything" (referring to the three plaintiffs, all but Barron, who hold supervisory positions in the police department), one council member asked him, "Are you saying this because they are white, Mr. Mayor?" He replied, "Maybe I am." There were a number of such comments, and the defendant's argument that only the four comments listed in the complaint, before pretrial discovery brought others to light, could be considered in deciding whether to grant summary judgment is frivolous. The defendant does not argue, however--which would also be frivolous--that the City of Markham is not legally responsible for the discriminatory actions of the mayor, city council, and board of fire and police commissioners; for they are the city government. See, e.g., McMillian v. Monroe County, 520 U.S. 781, 784-85 (1997); Pembaur v. City of Cincinnati, 475 U.S. 469, 480-84 (1986); West v. Waymire, 114 F.3d 646, 652 (7th Cir. 1997); Dill v. City of Edmond, 155 F.3d 1193, 1210-11 (10th Cir. 1998).

 Hunt and Clayton presented evidence that they were denied raises in 1996 and 1997 on account of their race and age; Barron that he was denied a temporary promotion to sergeant for similar reasons; and Gordon that he was constructively discharged when he quit after being told by the chief of police that he would never perform up to the mayor's expectations. The district court rejected Hunt and Clayton's claim on two grounds: that none of the derogatory comments was contemporaneous with the action of the city council in denying Hunt and Clayton raises or was shown to have influenced the council's action, and that the two were denied raises because of the city's parlous financial situation, as were all other nonunion employees of the city. The defendant adds a third ground--that the denial of a raise is not an adverse employment action for which relief can be granted in a federal suit.

 The district court overread language in a number of our cases to the effect that "stray remarks" of a derogatory character are not evidence of actionable discrimination. E.g., Cullen v. Olin Corp., 195 F.3d 317, 323 (7th Cir. 1999); Cianci v. Pettibone Corp., 152 F.3d 723, 727 (7th Cir. 1998); Bahl v. Royal Indemnity Co., 115 F.3d 1283, 1293 (7th Cir. 1997); Rush v. McDonald's Corp., 966 F.2d 1104, 1116 (7th Cir. 1992). All that these cases hold--all that they could hold

and still make any sense--is that the fact that someone who is not involved in the employment decision of which the plaintiff complains expressed discriminatory feelings is not evidence that the decision had a discriminatory motivation. That is simple common sense. It is different when the decision makers themselves, or those who provide input into the decision, express such feelings (1) around the time of, and (2) in reference to, the adverse employment action complained of. E.g., Bellaver v. Quanex Corp., 200 F.3d 485, 493 (7th Cir. 2000); Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714-15 (7th Cir. 1999); Bahl v. Royal Indemnity Co., supra, 115 F.3d at 1293; Cheek v. Peabody Coal Co., 97 F.3d 200, 203 (7th Cir. 1996); Stone v. Autoliv ASP, Inc., 210 F.3d 1132, 1140 (10th Cir. 2000); Vance v. Union Planters Corp., 209 F.3d 438, 442 (5th Cir. 2000). For then it may be possible to infer that the decision makers were influenced by those feelings in making their decision. This is such a case. Although the mayor does not vote at meetings of the city council, he recommends actions to them, including the denial of the raises sought by these two plaintiffs. Emanating from a source that influenced the personnel action (or nonaction) of which these plaintiffs complain, the derogatory comments became evidence of discrimination, as in such cases as Wichmann v. Board of Trustees, 180 F.3d 791, 801-02 (7th Cir. 1999) (per curiam), remanded for reconsideration on other grounds, 120 S. Ct. 929 (2000), and Sheehan v. Donlen Corp., 173 F.3d 1039, 1044 (7th Cir. 1999).

 There was also, it is true, evidence that the city could not afford raises not required by its union contracts; and Hunt and Clayton (also Gordon), being supervisors, were not covered by such a contract. Yet they did receive a raise in 1998--after this suit was filed--even though the city's financial situation had not improved. And they presented evidence that some black supervisors received not only raises, but also tuition reimbursements and free use of city cars, which they did not, during the years in which they were denied raises.

 The evidence that we have summarized created a triable issue of whether, but for the plaintiffs' race, they would have received raises or perks, or both, in 1996 and 1997. But this brings into view the third ground for the grant of summary judgment against Hunt and Clayton--that the denial of a raise (and we suppose a fortiori the denial of perks) is not an "adverse employment action." This term is found in innumerable cases interpreting the federal employment discrimination statutes, such as the Age Discrimination in Employment Act, 29 U.S.C.

sec.sec. 621 et seq., the Americans with Disabilities Act, 42 U.S.C. sec.sec. 12101 et seq., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. sec.sec. 2000e et seq. See, e.g., Conley v. Village of Bedford Park, No. 99-2659, 2000 WL 703806, *4 (7th Cir. May 31, 2000); Tarshis v. Riese Organization, 211 F.3d 30, 35 (2d Cir. 2000); Spears v. Missouri Dept. of Corrections & Human Resources, 210 F.3d 850, 853 (8th Cir. 2000) (distinguishing between "tangible" and "minor" changes in working conditions). But the plaintiffs' suit, so far as it alleges racial rather than age discrimination, is bottomed instead on 42 U.S.C. sec. 1981, a Reconstruction-era statute that forbids contractual discrimination in general rather than employment discrimination in particular. We attach no weight to this point, however, because the plaintiffs have failed to argue that there is any relevant difference between section 1981 and the ADEA (the two statutes on which their suit is based), and because the cases, since the amendment to section 1981 that superseded Patterson v. McLean Credit Union, 491 U.S. 164 (1989); see Harrington v. Harris, 118 F.3d 359, 367 n. 8 (5th Cir. 1997), treat the statutes as completely interchangeable. E.g., Johnson v. City of Fort Wayne, 91 F.3d 922, 940 (7th Cir. 1996); Johnson v. University of Cincinnati, No. 98-3016, 2000 WL 726528, *7 and n. 5 (6th Cir. Jun. 1, 2000); Hughes v. Ortho Pharmaceutical Corp., 177 F.3d 701, 704 (8th Cir. 1999); Stewart v. Rutgers, The State University, 120 F.3d 426, 432 (3d Cir. 1997); Harrington v. Harris, supra, 118 F.3d at 366-68.

 The idea behind requiring proof of an adverse employment action is simply that a statute which forbids employment discrimination is not intended to reach every bigoted act or gesture that a worker might encounter in the workplace. E.g., Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998); Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998); Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993); Savino v. C.P. Hall Co., 199 F.3d 925, 933 (7th Cir. 1999); Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 274 (7th Cir. 1996). The language of the statutes is consistent with such an understanding. They forbid discrimination in wages, benefits, working conditions, and other terms and conditions of employment. E.g., Title VII, 42 U.S.C. sec. 2000e-2(a)(2); Age Discrimination in Employment Act, 29 U.S.C. sec. 623(a)(1); Americans with Disabilities Act, 42 U.S.C. sec. 12112(a); 42 U.S.C. sec. 1981(b) as amended by the Civil Rights Act of 1991. Hence the cases that hold that workplace sexual harassment is not actionable unless the harassment is so severe that it can be said to

have altered the plaintiff's working conditions. E.g., Faragher v. City of Boca Raton, supra, 524 U.S. at 786; Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 752 (1998); Harris v. Forklift Systems, Inc., supra, 510 U.S. at 21; Silk v. City of Chicago, 194 F.3d 788, 804 (7th Cir. 1999).

The defendant's best case on the meaning of adverse employment action is Miller v. American Family Mutual Ins. Co., 203 F.3d 997, 1006 (7th Cir. 2000), which held that the denial of a bonus was not such an action within the meaning of Title VII. See also Rabinovitz v. Pena, 89 F.3d 482, 488-89 (7th Cir. 1996); Harrington v. Harris, supra, 118 F.3d at 366. Since a bonus is like a raise, the defendant asks us to rule that the denial of a raise cannot be an adverse employment action either. But there is a difference between a bonus and a raise. Bonuses generally are sporadic, irregular, unpredictable, and wholly discretionary on the part of the employer. Raises are the norm for workers who perform satisfactorily. When there is inflation, raises are necessary to keep the worker's wages from falling in real terms. The rate of inflation in the United States is no longer high, but it is positive, so that denying a raise to an employee means cutting his wage in real terms. And raises are the norm quite apart from inflation. They reward the increased productivity that comes with experience on the job, satisfy expectations for a rising standard of living, and combat the "last period" problem (the incentive for a worker to slack off as he approaches retirement) by making it costly to the worker to be fired (because he will lose a wage made generous by steady raises).

A bonus, too, is an incident of the employment relation, rather than something unrelated to it, something only adventitiously connected with the workplace. But the denial of a bonus is inherently ambiguous, as well as less damaging to the employee because he didn't count (or at least should not have counted) on it. Problems of proof and the principle de minimis non curat lex combine to place such denials beyond the reach of the employment discrimination statutes, or so at least our cases hold. The denial of a raise is more likely to reflect invidious motivation than the denial of a bonus, after alternative explanations based on the worker's performance or the employer's financial situation are excluded-- and there is evidence here, as we have seen, that may exclude them. We conclude that the "bonus" rule of Miller does not extend to raises. See also Gupta v. Florida Bd. of Regents, No. 98-5392, 2000 WL 633024, *14 (11th Cir. May 17, 2000); Gumbhir v. Curators of University of Missouri, 157 F.3d 1141, 1144 (8th Cir. 1998).

As for plaintiff Barron, the defendant points out that he flunked the test for sergeant the only three times that he took it. This would be dispositive if he were seeking a permanent promotion to sergeant, but he is not; he is seeking a temporary promotion, with the raise that would come automatically with it. The denial of a promotion is an adverse employment action, see, e.g., Burlington Industries, Inc. v. Ellerth, supra, 524 U.S. at 761; Ribando v. United Airlines, Inc., 200 F.3d 507, 511 (7th Cir. 1999); Wallace v. SMC Pneumatics, Inc., 103 F.3d 1394, 1397 (7th Cir. 1997); Allen v. Michigan Dept. of Corrections, 165 F.3d 405, 410 (6th Cir. 1999), and the defendant does not argue that the denial of a temporary promotion is like denying a bonus. It is not. Some of the temporary promotions to sergeant made by the City of Markham have lasted as long as five years.

A temporary promotion does not require passing the sergeant's test--or anything else. The city gave such a promotion to a black patrolman after he was released from prison for having, while a police officer, violated the civil rights of a resident of Markham. It is a triable issue whether Barron's "offense" of failing the sergeant's test three times was worse, and if it is not, an inference of racial discrimination from the derogatory comments that litter the record would not be unreasonable.

That leaves only the question whether Gordon was constructively discharged. The term "constructive discharge" refers to the situation in which an employer, without firing an employee, makes his working conditions so miserable that it drives him to quit. See, e.g., Tutman v. WBBM-TV, Inc./CBS, Inc., 209 F.3d 1044, 1050 (7th Cir. 2000); Simpson v. Borg-Warner Automotive, Inc., 196 F.3d 873, 877 (7th Cir. 1999); Spears v. Missouri Dept. of Corrections & Human Resources, supra, 210 F.3d at 854. The defendant argues that since Gordon was treated no worse than Hunt and Clayton, and they haven't resigned, the conditions couldn't have been that bad for Gordon. That is a non sequitur. Just as a person who is totally disabled in a medical and legal sense may nevertheless work, out of desperation, Jones v. Shalala, 21 F.3d 191, 192-93 (7th Cir. 1994), so a person may out of desperation or simple stubbornness cling to his job despite provocations that would cause the average person to quit in disgust. A person who is told repeatedly that he is not wanted, has no future, and can't count on ever getting another raise would not be acting unreasonably if he decided that to remain with this employer would necessarily be inconsistent with even a minimal sense of self-respect, and therefore intolerable.

We are mindful of Smith v. Bath Iron Works Corp., 943 F.2d 164, 167 (1st Cir. 1991), which suggests without quite holding that no claim of constructive discharge can be lodged if the employee did not actually quit, but it does not appear to have been argued there that extraordinary circumstances may have held the employee (in this case Hunt and Clayton) to his job who otherwise would have been reasonable in quitting.

Reversed.