In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 06-4328

JANET M. RIDINGS,

*Plaintiff-Appellant*,

*v.*

RIVERSIDE MEDICAL CENTER,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Central District of Illinois.
No. 05 C 2134—**Michael P. McCuskey**, *Chief Judge.*

---

ARGUED JANUARY 9, 2008—DECIDED AUGUST 11, 2008

---

Before WOOD, SYKES, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Janet Ridings brought this action alleging that her former employer, Riverside Medical Center, interfered with her rights and retaliated against her in violation of the Family and Medical Leave Act ("FMLA") and retaliated against her in violation of the Illinois Workers' Compensation Act. The district court granted Riverside's motion for summary judgment on all claims. We affirm the district court's decision.

## I. Background

The following facts are construed in the light most favorable to Ridings, the non-moving party. *South v. Ill. Envtl. Prot. Agency*, 495 F.3d 747, 751 (7th Cir. 2007). Ridings was an employee of Riverside Medical Center from October 1998 until May 13, 2004. As a Knowledge Manager, Ridings's work primarily required her to respond to requests from Riverside employees for Ridings to extract data from Riverside's computer databases through query reports. Riverside classified Ridings as a full-time exempt employee. Riverside required full-time exempt employees to "swipe in" to the time-keeping system every day, but the employees' hours were not tracked.

In December 2002, Ridings was diagnosed with Graves' disease, which is a disorder of the thyroid. In January 2003, Ridings's doctor advised her to have her thyroid removed. Ridings applied for a leave of absence from Riverside pursuant to the FMLA. Ridings completed an FMLA leave application form and submitted a medical certification form to her doctor, as required by Riverside. Riverside granted the FMLA leave for two weeks and later permitted Ridings to extend the leave for one additional week after her surgery. Ridings returned to work after her surgery on February 3, 2003, and she worked from about 8:00 a.m. until 12:00 p.m. for a few weeks. Thereafter, she gradually increased her hours at work until she was working nearly a full day. On two occasions in 2003, Ridings nearly fell asleep while driving home; thereafter, she did not work past 4:30 p.m. unless she had a ride home.

In June 2003, Ridings received an annual evaluation of her work from her supervisor, Kyle Hansen. Ridings

received an overall rating of "Key Contributor" which is one step below the highest possible ranking of "Role Model." Many employees at Riverside were ranked as "Key Contributors," including Hansen and his supervisor Jeff Pollack.

In July 2003, Ridings submitted a claim under the Illinois Workers' Compensation Act, asserting that she had developed Graves' Disease due to workplace stress.[1] Also in July 2003, Ridings began working on a large project relating to Riverside's payroll system, which she completed in January 2004. Due to the removal of her thyroid, Ridings was required to take medication replacing the hormones that are normally produced by the thyroid, and that medication was adjusted by her doctor at certain intervals throughout the year. Ridings continued to work on the premises of Riverside less than eight hours per day for the remainder of the year because she frequently became fatigued by the end of the day. Ridings regularly took work home in the evenings and on weekends.

On January 25, 2004, Hansen discussed Ridings's work schedule with her, and he expressed that she needed to begin working a full eight-hour day on the premises. On February 25, 2004, Hansen again met with Ridings to request that she work a full eight-hour day. Ridings did not

---

[1] Although the cause of Graves' disease is unknown, stress is believed to be a factor that increases a person's likelihood of developing the disease. *See Graves' Disease: Causes*, http://www.mayoclinic.com/health/graves-disease/DS00181/DSECTION=3 (last visited July 18, 2008).

adjust her work schedule after either meeting. On March 11, 2004, Hansen drafted a "corrective action report" ("CAR") regarding Ridings's work schedule and sent it to Becky Hinrichs, Riverside's Director of Human Resources, for her to review. The document was forwarded to Brent Mallek, Riverside's Vice President for Human Resources. Mallek recommended that Hansen remove the CAR's references to Ridings's need to provide medical documentation.

Hansen took Mallek's advice and gave Ridings the modified CAR on March 22, 2004. The CAR stated that Ridings's attendance was unsatisfactory because she had not been working a full eight-hour day. The report also stated that Ridings must begin working a full eight-hour day immediately and advised her that the next action taken, if she did not comply, would be to place a warning in her personnel file. Ridings signed the CAR, as required by the disciplinary process, but noted that she had asked what sort of medical documentation she should supply but her question had not been answered.

Ridings provided a note from her doctor on the same day, March 22, 2004, which stated that she could not work an eight-hour day because of a medical condition until further notice. On April 1, 2004, Hansen met with Ridings and informed her that based on her doctor's note, she needed to provide Riverside with FMLA paperwork. He gave Ridings an FMLA leave application to complete and an FMLA medical certification form for her physician to complete. On April 16, 2004, Hansen asked Ridings about the FMLA forms. She presented Hansen with her attor-

ney's business card and stated that her attorney needed to handle the matter.

On April 21, 2004, Hansen provided Ridings with another CAR. The CAR stated that Ridings had failed to adhere to policy because she "[d]id not complete FMLA paperwork as requested in 15 day period." The CAR stated that the "expected improvement" for Ridings would require that "FMLA paperwork requesting intermittent leave . . . be completed by her physician and presented back to her supervisor by April 28, 2004." The CAR stated that the next action taken if the FMLA forms were not completed would be to place Ridings on suspension for three days without pay. If she returned to work after the suspension without presenting the FMLA paperwork to Hansen, then she could be terminated. Ridings signed the CAR, objecting to the disciplinary process.

On May 10, 2004, Hansen provided a third CAR to Ridings. At that time, Ridings was suspended for three days without pay because she "did not turn in FMLA paperwork requesting intermittent leave by April 28, 2004."[2] The CAR identified the next action that would be taken: "Upon returning to work after the suspension, if the FMLA paperwork is not presented then further action, up to and including termination may be taken." Ridings signed the CAR, again objecting to the disciplinary process.

---

[2] Ridings's complaint also alleged that her suspension without pay violated the Fair Labor Standards Act ("FLSA"). The district court found that Ridings's FLSA claim failed, and she does not appeal this determination.

On May 13, 2004, Ridings returned to work after her suspension without the completed FMLA paperwork, and Riverside terminated her employment.

## II. Analysis

We review a district court's grant of summary judgment de novo. *South*, 495 F.3d at 751. We view all facts and the reasonable inferences drawn therefrom in the light most favorable to the non-moving party. *Id.* Summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (citing Fed. R. Civ. P. 56(c)).

### A. FMLA Interference

The FMLA entitles an eligible employee up to twelve work weeks of leave during a twelve-month period where the employee has a serious health condition that renders her unable to perform the functions of her position. 29 U.S.C. § 2612(a). The FMLA also permits the employee to take leave intermittently or on a reduced schedule when medically necessary. *Id.* § 2612(b). Under the FMLA, it is unlawful for an employer to interfere with an employee's attempt to exercise the rights established by the FMLA. *Id.* § 2615(a). An employee does not need to be aware of her rights in order to invoke them; "[t]he employee need not expressly assert rights under the FMLA or even mention

the FMLA, but may only state that leave is needed." 29
C.F.R. § 825.303(b).

To prevail on an FMLA interference claim, an employee
must show that her employer deprived her of an FMLA
entitlement. *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir.
2006). The employee must establish that: (1) she was
eligible for the FMLA's protections; (2) her employer was
covered by the FMLA; (3) she was entitled to leave under
the FMLA; (4) she provided sufficient notice of her intent
to take leave; and (5) her employer denied her FMLA
benefits to which she was entitled. *Id.*

We address each of the parties' arguments: that the
district court failed to acknowledge Riverside's factual
admission, that Ridings failed to invoke her FMLA rights,
that Riverside failed to responsively answer her questions
about FMLA certification, that Riverside was attempting to
force Ridings to take intermittent leave, that Riverside
never requested medical certification from Ridings, that
Riverside did not give Ridings the opportunity to cure any
deficient certification, that Riverside's discipline and
termination of Ridings was unauthorized, and that Ridings
was working a full schedule based on Riverside's policies.

The parties do not dispute that Riverside is an employer
covered by the FMLA or that Ridings was an eligible
employee. Ridings initially alleged in her complaint that
she did not have a serious health condition; however, in
her appellate brief, she stated that the district court prop-
erly determined that she did have a serious health condi-
tion. Although Riverside noted that Ridings had originally
claimed not to have a serious health condition, it did not

otherwise dispute that her illness should be treated as a serious health condition.

Ridings contends that the district court erred when it granted summary judgment in favor of Riverside because the court failed to consider evidence in her favor and ignored factual admissions by Riverside. Many of Ridings's arguments rely upon an admission made in Plaintiff's Interrogatory Number 6. The interrogatory requested: "State all dates on which plaintiff was on leave, of any kind, from her employment by Riverside between January 1, 2002 and May 13, 2004 and, for such leave, state how it was categorized by Riverside (sick leave, vacation, FMLA, etc.)." Riverside's answer stated that Ridings "was on a reduced leave schedule under the FMLA from February 3, 2003 to May 13, 2004." Before the close of discovery, Riverside amended its response to Interrogatory Number 6 and stated:

> Plaintiff did not work her scheduled hours from February 3, 2003 to May 13, 2004. Technically, this period was FMLA leave, *see Ragsdale v. Wolverine World Wide, Inc.*, [535] U.S. 81 (2002), although her reduced hours were never designated FMLA leave by Riverside. On April 24, 2004, Riverside requested medical certification from Plaintiff to determine her status and whether her reduced hours schedule should be designated FMLA leave. Due to Plaintiff's refusal to produce certification, no determination was ever made as to her status.

The district court did not refer to either interrogatory answer in its written opinion. Oddly, Riverside did not

mention on appeal that the interrogatory answer had been amended, despite Ridings's frequent reliance upon the original answer to the interrogatory. Riverside again explained its original interrogatory answer with the contention that, under *Ragsdale*, Ridings's leave was considered FMLA leave "by operation of law" despite Riverside's failure to designate it as such.

FMLA regulations require that an employer designate leave as FMLA-qualifying and give notice of the designation to the employee. 29 C.F.R. § 825.208. In *Ragsdale*, the Supreme Court invalidated a regulation that required an employer to provide an employee with twelve additional weeks of leave if the employer had failed to designate leave taken by the employee as FMLA-qualifying. *Ragsdale*, 535 U.S. at 96. The Court reasoned that the regulation "alter[ed] the FMLA's cause of action in a fundamental way" because it "relieve[d] employees of the burden of proving any real impairment of their rights and resulting prejudice." *Id.* at 90. Riverside's explanation that Ridings's leave was FMLA leave "by operation of law" overstates *Ragsdale*'s holding; regardless, Ridings does not contend that she was prejudiced by Riverside's failure to designate leave as FMLA-qualifying. Indeed, she benefitted from a reduced schedule leave for more than a year before Riverside signified to Ridings that she would need to demonstrate FMLA entitlement in order to continue working a reduced schedule on the premises.

Riverside contends that Ridings's FMLA interference claim fails because Ridings never invoked her FMLA rights. Of course, "[a]n employee need not expressly

mention the FMLA . . . or otherwise invoke any of its provisions" when requesting leave. *Burnett*, 472 F.3d at 478. Riverside analogizes Ridings's FMLA request to the employee's request for leave in *Bailey v. Southwest Gas Co.*, 275 F.3d 1181 (9th Cir. 2002). In *Bailey*, the employee presented to her employer a note from her doctor stating that she could not work overtime because of a prescribed medication that had the side effect of sedation. The employer responded by seeking additional information from the employee about her condition, and it informed her that she might be entitled to leave under the FMLA. The employee then clarified that she was not actually sick or disabled; she simply objected to working the amount of overtime required because she felt it was unsafe. The employee failed to provide her employer with a certification form containing sufficient information to determine whether the FMLA was applicable to her, and the employer subsequently terminated her. In evaluating the employee's claim for FMLA interference, the court noted that the employee had "concede[d] that she did not have a qualifying health condition, that she never requested FMLA leave, and that she would not have taken FMLA leave had it been offered." *Id.* at 1186. The court concluded that because the employee "never sought to invoke her FMLA rights, she may not now argue that [her employer] interfered with the exercise of her rights by suggesting the FMLA might apply, providing her with information on it, and seeking a medical certification of her condition." *Id.*

*Bailey* is similar to this case in many respects. Riverside presented evidence that Ridings conceded that she had not requested leave and did not actually want to take FMLA

leave. As Ridings points out, in *Bailey*, the employee told her employer that she was not sick, and the employer was not aware of the employee's medical history because she had not previously taken time off from work. Ridings did have a serious medical condition; she testified in her deposition that Hansen asked for periodic updates and that she kept him apprised of her condition. Riverside permitted Ridings to work a reduced schedule for more than a year because of its understanding of her medical condition. Viewing the evidence in favor of Ridings, we cannot conclude that Ridings failed to "invoke" her FMLA rights.

Ridings has presented evidence that in March 2004 Riverside initially attempted to avoid discussing Ridings's FMLA rights with her and was unresponsive to her requests for more information. Riverside's interaction with Ridings at the beginning of the disciplinary process concerns us. The FMLA regulations require employers to "responsively answer questions from employees concerning their rights and responsibilities under the FMLA." 29 C.F.R. § 825.301(d).

The first draft CAR, as originally written, stated that Ridings's attendance was unsatisfactory:

> Janet has been arriving at work between 8a and 8:30a, leaving for lunch, returning, and leaving for the day between 2:30p and 3:00p. Last year after surgery, this was allowed as she was adjusting medicine that made her extremely tired in the afternoon. No medical documentation was received at that time, and after almost a year, was recently requested, but has not been delivered.

The CAR stated in the "expected improvement" section of the form that

> [u]nless medical documentation is received, working a full 8 hour day must begin immediately, whether it is from 8-5 or 8:30a-5:30p, etc. depending on Janet's schedule. Upon receipt of a doctor's order, further discussion will need to be held in regards to current and future task responsibilities for this position, and Janet's ability to carry them out.

At the drafting stage of this document, Mallek suggested that Hansen remove all references to Ridings's need to provide medical documentation. Mallek wrote: "Simply state that attendance is expected and the duties of her job require 8 hours per day of work. If and when she produces documentation to support a need to accommodate her we will have to evaluate it at that time."

   Therefore, the first CAR given to Ridings failed to inform her that she might be entitled to leave under the FMLA. Instead, the CAR simply stated that her attendance was unsatisfactory because she had been arriving between 8:00 and 8:30 a.m. and leaving between 2:30 and 3:00 p.m. The form advised her that she would receive a warning in her personnel file if she did not begin working a full eight-hour day immediately. Ridings apparently understood at the time of the first CAR that Riverside needed documentation of her medical condition because she noted on the CAR that she "requested clarification on what was needed from my physician. That information was not provided." Hansen wrote in an email to Becky Hinrichs after he had given Ridings the CAR: "[Ridings] was wanting me to put

something in writing requesting actually what I wanted from the doctor. Brent [Mallek] indicated that I do not need to request anything, but that she work an 8 hour day." We recognize that the situation was unusual, in that Ridings had been working a reduced schedule for approximately one year before Riverside began to voice concern about her hours. Nevertheless, Riverside should have "responsively answer[ed] questions" rather than fostering a climate of secrecy regarding its expectations of Ridings. 29 C.F.R. § 825.301(d).

Despite Riverside's failure to answer Ridings's request for more information, we do not believe this constitutes interference. Although she noted that Riverside did not answer her questions, Ridings did not allege that Riverside's initial failure to provide her with FMLA information prejudiced her. *See Ragsdale,* 535 U.S. at 90-91 (holding that an employee must demonstrate that an interference with FMLA rights was prejudicial to her). As we will discuss in greater detail, Riverside provided Ridings with the FMLA forms she needed after the first CAR, and it gave her ample opportunity to fulfill its request for additional information from her physician.

Riverside contends that summary judgment in its favor was proper because it complied with the FMLA. It argues that it was entitled to ask Ridings for medical certification of the reason for her leave, and Ridings failed to respond to that request. Ridings asserts that Riverside never asked her for medical certification.

The FMLA permits an employer to require that a request for leave due to a serious health condition be supported by

certification issued by the health care provider of the employee. 29 U.S.C. § 2613(a). It is undisputed that the only medical information that Ridings supplied to Riverside in writing from her physician, other than the FMLA forms for her initial surgery, was the note stating that "[patient] cannot work 8 [hour] day [illegible] medical condition until further notice." Ridings objects to Riverside's repeated contentions that it had requested medical certification from Ridings. Ridings's assertions to the contrary focus on the language used in the CARs, emphasizing that Riverside asked Ridings to apply for "intermittent" FMLA leave rather than asking for medical certification. However, the evidence shows that Riverside gave Ridings two FMLA forms: a "request for leave of absence" and a "medical certification for leave of absence."

First, we address Ridings's concern that Riverside was attempting to require her to take "intermittent leave" rather than asking for certification. Ridings's primary contention of Riverside's interference with her FMLA entitlement is that, per Riverside's admission in Interrogatory Number 6, she was already taking reduced schedule FMLA leave when Riverside began unlawfully attempting to force her to apply for intermittent leave. Her refusal to comply with Riverside's request led Riverside to discipline and terminate her in violation of the FMLA.

Riverside contends that Ridings should not be permitted to rely on this allegation. Ridings's initial complaint alerted Riverside that Ridings was claiming FMLA interference, albeit under a different theory, based upon Riverside's discipline of Ridings during March, April, and May 2004.

During discovery, Ridings learned that Riverside had used the term "intermittent leave," and filed a motion for leave to amend the complaint to add FMLA interference under that theory. The district court denied the motion but still addressed the theory in its opinion because Ridings relied upon it in her summary judgment brief. The district court appropriately considered the theory because "[h]aving specified the wrong done to [her], a plaintiff may substitute one legal theory for another without altering the complaint." *Albiero v. City of Kankakee*, 122 F.3d 417, 419 (7th Cir. 1997). Ridings advances this theory again on appeal, and we will consider it.

We note that there is no dispute that the second, third, and final CAR referred to Ridings's need to submit FMLA forms for "intermittent leave." The FMLA defines intermittent leave as "leave taken in separate blocks of time due to a single qualifying reason." 29 C.F.R. § 825.203(a). Reduced schedule leave is defined as "a leave schedule that reduces an employee's usual number of working hours per workweek, or hours per workday. A reduced leave schedule is a change in the employee's schedule for a period of time, normally from full-time to part-time." *Id.* It is apparent that the most appropriate type of FMLA leave for Ridings to have taken was, in fact, reduced schedule leave because she was leaving early nearly every day.

The FMLA imposes some requirements upon the employer and the employee that are generally applicable to all types of leave. *See, e.g.*, 29 U.S.C. § 2614 (employment and benefits protection); 29 C.F.R. § 825.301 (employer's notice obligations). The FMLA also imposes requirements that are

specific to intermittent and reduced schedule leave. *See, e.g.,* 29 U.S.C. §§ 2613(b)(5)-(7) (certification requirements for intermittent and reduced schedule leave). Although ultimately the schedule of the employee would be different depending on whether the employee was taking intermittent or reduced schedule leave, we conclude that the requirements under the FMLA statute and regulations that were implicated by the facts of this case were identical regardless of which type of leave was being taken. Any relevant provision addressing intermittent or reduced schedule leave imposed the same obligations on the employer and employee without regard to the type of leaving being taken.

Turning to Riverside's requirements for FMLA leave, we note that Riverside had a written policy for FMLA leave. Under the policy section entitled "Notice of Leave," Riverside explained the employee's legal obligations to give Riverside notice of medical leave. Riverside identified that it had a particular form to use when requesting a leave of absence. Under the policy section entitled "Medical Certification," Riverside explained that medical certification is required for leave resulting from a serious medical condition. Riverside identified that it also had a particular form to use for medical certification.

Neither form was tailored to a particular type of leave. The "application for leave" form required an employee to list her name, department, social security number, and the date. The next section of the form required the employee to check the box corresponding to the type of leave being requested. The first box was labeled "Regular Leave (More

than 3 consecutive calendar days)." The second box was labeled "Intermittent Leave or Reduced Schedule Leave." The following section of the form required the employee to check the box corresponding to the purpose of the leave. The employee had six options: employee medical condition, family member medical condition, adoption/foster care, extension of leave, personal, or other. The employee then needed to identify the dates of the requested leave and the name of her healthcare provider. Finally there were four fill-in-the-blank questions: "Frequency of Intermittent Leave," "Requested Schedule Change of Reduced Schedule Leave," "Is this an Extension of Previously Approved Leave?" and "How Long is the Extended Leave Needed?" The employee was required to sign the bottom of the form. The "request for medical certification" form required the employee to describe the illness or injury and the date of its occurrence and sign the form. The employee's physician would fill out the rest of the form, which asked pertinent questions to assist Riverside in determining whether the employee was entitled to FMLA leave due to the illness or injury.

We conclude that Ridings's obligations under Riverside's policies were also essentially identical regardless of which type of leave she was taking. She would have filled out the same forms, checked the same boxes, and had the same obligations to provide medical certification. The only difference would have been Ridings's need to answer one alternate fill-in-the-blank question on Riverside's application form.

We acknowledge that the CARs are clear that Ridings was directed to apply for "intermittent leave." However,

we cannot conclude from the evidence presented that the term "intermittent" was used, as Ridings contends, in an attempt to force her to cease taking a reduced schedule leave and apply anew for intermittent leave. The application form was used for all types of leave, including extensions of leave. The deposition testimony of Hansen, Hinrichs, and Pollack indicated that each one expected Ridings to either complete the FMLA paperwork or begin working a full schedule. Hansen, who drafted the CARs, testified that he believed intermittent and reduced schedule leave were "one and the same." No evidence was presented from which we could reasonably infer that Riverside meant for Ridings to apply for a type of leave that required her to start working a full workweek on a regular basis while permitting her to miss the occasional full day.

We do not wish to trivialize Riverside's mistake, because it is the "employer's responsibility to determine the applicability of the FMLA." *Price v. City of Fort Wayne*, 117 F.3d 1022, 1026 (7th Cir. 1997). Certainly, if Ridings had presented any evidence that the use of the term "intermittent" had in any way influenced her decision not to turn in the FMLA forms, we would consider that fact and the reasonable inferences drawn therefrom in favor of Ridings. However, Ridings's own complaint, summary judgment exhibits, and deposition testimony indicate that her reasons for failing to turn in the FMLA forms were entirely unrelated to the use of the term "intermittent."

Ridings testified in her deposition that she did not return the FMLA forms because she had not requested a leave;

she explained that she supplemented her schedule by working from home, and she was, therefore, not taking leave. Ridings's complaint stated that she "did not desire to take medical leave under FMLA. She further knew that she did not have a serious health condition . . . and was not receiving continuing treatment by a heath care provider . . . . Therefore, [Ridings] refused to apply for FMLA leave and declined to provide the requested medical certification." Finally, Ridings's written comments on the last CAR state: "The FMLA forms were requested by my supervisor with the clear intent of treating me as an hourly employee." We conclude that Riverside's reference to the wrong type of leave, under the unusual facts of this case, did not excuse Ridings from complying with her FMLA obligations.

Next, we consider Ridings's contention that Riverside never requested medical certification. Ridings argues that the CARs all reference her need to apply for intermittent leave, but Ridings does not point to any evidence to dispute that Riverside provided her with an FMLA medical certification form in addition to giving her the CARs. In contrast, a significant amount of evidence indicates that Riverside had, indeed, requested medical certification. For instance, when counsel for Riverside showed Ridings a document during her deposition, Ridings identified it as "a medical certification for leave." She stated that she believed it was the same document that Hansen had given her to complete in 2004, although she was not entirely certain. She answered questions repeatedly about Riverside's request for "certification" without ever expressing her belief that she had not been asked to provide certifica-

tion. Finally, Ridings's own complaint stated: "[Ridings] refused to apply for FMLA leave and declined to provide the requested medical certification." Ridings's unsupported contentions that Riverside never asked her for medical certification cannot be used to create a genuine issue of material fact. *See Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 604 (7th Cir. 2001) (explaining that a party's "self-serving allegations . . . are insufficient to create a genuine issue of material fact").

Ridings also asserts that there is no evidence that Riverside's request for medical certification was a written request. An employer must give notice of a requirement for medical certification each time a certification is required. 29 C.F.R. § 825.305(a). The notice must state the consequences of failing to provide certification. *Id.* § 825.301(b)(1)(ii). The notice for an initial medical certification must be in writing, unless the employee has been provided with written copies of the employer's FMLA policies within the past six months; subsequent requests for certification can be made orally. *Id.* § 825.305(a); *Id.* § 825.301(b)(1)(ii).

Ridings argues that the only written request that Riverside made was for her to apply for intermittent leave. She does not argue that the medical certification form she was given could not constitute a written request. Riverside gave Ridings the FMLA paperwork on April 1, 2004. The medical certification form contained a warning at the top of the form in bold text that the form must be returned within fifteen days or the leave request will be delayed. The FMLA "does not require the employer to request medical documentation on a particular form. All that is

required is that the employee be informed in writing that he or she has 15 days in which to submit proof of a serious health condition, and of the consequences if it is not submitted within the deadline . . . ." *Rager v. Dade Behring, Inc.*, 210 F.3d 776, 778 (7th Cir. 2000). Ridings received the medical certification form which documented the necessary information that was required to be given to her, and so she received appropriate written notice of her obligations under FMLA.

Ridings objects to the district court's characterization of the note from her doctor as "notice" to Riverside, which triggered its request for medical certification. An employer is entitled to notice that an employee will need FMLA leave. When the employee's need for leave is foreseeable, the employee must give the employer thirty days notice; otherwise, the employee should inform the employer "as soon as practicable." 29 C.F.R. § 825.303(a). Ridings has presented evidence that Riverside was aware of her surgery and the fatigue caused by the medication throughout the following year. There is no evidence that Ridings gave Riverside notice of a need to take reduced schedule leave in the explicit terms set forth in the regulations, but Ridings's deposition testimony indicated that when asked by Hansen about her recovery, she explained her problem with fatigue caused by the medication. As Ridings contends, the note from her doctor in March 2004 could not constitute "notice" in the usual sense—where an employee informed the employer of an illness of which it may have been completely unaware.

The FMLA contemplates, however, that at some point in time an employer would be justified in seeking some

additional medical information. The regulations provide that generally, an employer should ask that the employee furnish certification at the time the employee requests to take the leave; however, the regulations permit an employer to request certification at a later date if the employer "has reason to question the appropriateness of the leave or its duration." 29 C.F.R. § 825.305(c). Riverside had received a medical certification form for Ridings's FMLA leave for her surgery in January 2003, and, according to Ridings, Riverside had verbal updates throughout the year. It would have been lawful under the FMLA for Riverside to eventually ask Ridings for medical documentation to substantiate her continued need to work a reduced schedule, and the note from her physician could be considered "notice" that the FMLA might still be implicated by her condition.

Ridings also asserts that the request Hansen gave her for "some type of documentation" was fulfilled by the note from her doctor and was "fully responsive" to his request. She argues that, given what Riverside already knew about her condition, the note should have been sufficient certification, or she should have been given the chance to supply adequate information. Medical certification is sufficient if it states the date on which the serious health condition commenced, the probable duration of the condition, the appropriate medical facts within the knowledge of the health care provider regarding the condition, and a statement that the employee is unable to perform the functions of the employee's position. 29 U.S.C. §§ 2613(b)(1)-(4). In the case of certification for intermittent or reduced schedule leave, the certification must include the dates on which

planned medical treatment is expected to be given and the duration of such treatment, as well as a statement of the medical necessity for the intermittent or reduced schedule leave and the expected duration of such leave. *Id.* §§ 2613(b)(5)-(7). Where medical certification is incomplete, the employer must advise the employee of the information's insufficiency and provide the employee a reasonable opportunity to cure the deficiency. 29 C.F.R. § 825.305(d).

Ridings admits that the doctor's note does not contain all the information to which Riverside was entitled but suggests that it knew the relevant medical facts and could determine that she qualified for FMLA leave. She has presented evidence that Riverside was aware of the beginning date of her medical condition and that her fatigue was caused by her medication. However, Riverside was entitled to receive additional information, and it demonstrated that it was particularly interested to know the expected duration of her leave. Ridings did not provide Riverside with this information. Even assuming that the doctor's note constituted "certification," Riverside certainly gave Ridings a reasonable opportunity to cure any deficiency in it, when it repeatedly told her from April 1, 2004, until her termination on May 13, 2004, that she needed to fill out the FMLA paperwork. That paperwork included a medical certification form for her doctor with questions that were designed to supply Riverside with the pertinent medical information it needed to determine whether Ridings was entitled to FMLA leave and to assess its own employment needs for the duration that Ridings would be working a reduced schedule.

Ridings next contends that the disciplinary action taken against her was not authorized by statute, regulation, or Riverside's policies. 29 C.F.R. § 825.312(b) provides:

> If an employee fails to provide in a timely manner a requested medical certification to substantiate the need for FMLA leave due to a serious health condition, an employer may delay continuation of the FMLA leave until an employee submits the certificate. If the employee never produces the certification, the leave is not FMLA leave.

(internal citations omitted). However, an employer must have advised the employee of the anticipated consequences of the employee's failure to provide adequate certification. 29 C.F.R. § 825.305(d). Riverside's medical leave policy states:

> If you are requesting leave because of your own serious health condition, you and the relevant health care provider must supply appropriate medical certification . . . . The medical certification must be given within 15 days after it is requested, or as soon as reasonably possible under the circumstances. Failure to provide requested medical certification in a timely manner may result in denial of leave until it is provided.

Riverside's medical certification properly warned that: "Form must be returned within 15 days or leave request may be delayed." Riverside's policy on attendance stated: "Excessive absenteeism that is not considered a serious health condition under the Family and Medical Leave Act (FMLA) will lead to disciplinary action, up to and including termination."

Ridings contends that Riverside cannot terminate her for excessive absenteeism because it admitted in the interrogatory that she was on leave on the day of her termination; therefore, her reduced hours could not have been considered absences. As previously noted, Riverside amended this interrogatory. The Federal Rules of Civil Procedure require a party who has responded to an interrogatory to supplement or correct its response in a timely manner if the party learns that "in some material respect the . . . response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1)(A). Riverside corrected its earlier response before the close of discovery to reflect the fact that, at the time of her termination, Ridings had not been working a full schedule at Riverside, but Riverside never made a determination as to the applicability of the FMLA to Ridings because of her failure to turn in the forms. Other than Riverside's prior interrogatory answer, Ridings has presented no evidence to contradict Riverside's corrected statement; whereas, a significant amount of evidence shows that the original interrogatory answer was inaccurate. It is uncontradicted that Ridings was working a reduced schedule in 2003 and 2004. However, the evidence shows that Ridings conceded repeatedly in her deposition that she had not requested FMLA leave, other than for her surgery in January 2003, and she did not believe that she was taking leave. Viewing the facts in Ridings's favor, however, we will assume that because she was working a reduced schedule in 2003 and 2004, she was on FMLA leave. On April 1, 2004, however, Riverside requested that she fill out an FMLA form and certification form, and she failed to complete them. Therefore, the times in which

Ridings left early from the date on which the forms were due, April 16, until her termination on May 13, 2004, were not considered FMLA-excused absences, and so Ridings was no longer "on FMLA leave" after April 16, 2004.[3]

Ridings states that "even if Riverside did request medical certification . . . Riverside's remedy was to delay the leave, not to terminate Ridings." Where an employee's leave is delayed, the subsequent absences are not excused, and Riverside's policies explicitly stated that extensive absences which were not covered by FMLA would lead to disciplinary action, "up to and including termination." *See Rager*, 210 F.3d at 778 (concluding that an employee's termination was appropriate because any absence beyond the deadline for turning in medical certification was not an entitled absence under the FMLA). Riverside's policies permitted it to terminate Ridings for absenteeism because she did not demonstrate FMLA entitlement; therefore, her termination was not unlawful.

Riverside also contends that it could have terminated Ridings for insubordination. Ridings objects to that charac-

---

[3] Ridings's initial complaint alleged FMLA interference because Ridings "did not desire to take medical leave under FMLA," and Riverside attempted to force her to take leave. We addressed a similar argument recently in *Dotson v. BRP U.S. Inc.*, 520 F.3d 703, 708 (7th Cir. 2008). If an employee does not wish to take FMLA leave but continues to be absent from work, then the employee must have a reason for the absence that is acceptable under the employer's policies, otherwise termination is justified. *See id.*

terization because the evidence—for example, the final CAR—never mentions that she was insubordinate. The evidence demonstrates that Riverside terminated Ridings for repeatedly ignoring its requests to either turn in the FMLA forms or begin working a full schedule. Ignoring repeated requests from a supervisor is insubordination. Riverside's employee conduct policy prohibited insubordination, and so her termination would have been justified on those grounds as well.

Finally, Riverside contends that our decision in *Darst v. Interstate Brands Corp.*, 512 F.3d 903 (7th Cir. 2008) demonstrates that if Ridings had been working eight hours per day on the premises and at home, as she contends that she did, then she is not eligible for FMLA leave. In *Darst*, the employee sought treatment for alcoholism and was hospitalized for eight days. He was also absent from work for three days prior to his hospitalization. The employee was terminated for absenteeism based upon several earlier absences and the three days he was absent prior to his hospitalization. We held that because the employee had not demonstrated that he was receiving treatment that rendered him unable to work on those three days, he did not demonstrate FMLA entitlement. *Id.* at 912.

We agree that if Ridings was fulfilling the requirements of her job, then she would not be entitled to FMLA leave. Ridings contends that she was working eight hours per day when counting the hours she worked from home. Because Riverside insisted that Ridings work eight hours per day on the premises, however, it is a reasonable inference that working eight hours on the premises was an essential

function of her position. Ridings has presented evidence that she was unable to work a full schedule at work without going home to rest. Therefore, *Darst* does not foreclose Ridings's entitlement to FMLA because, although she was able to work eight hours somewhere, she was not able to work eight hours on the premises, as her employer required.

Ridings notes that Riverside had a policy that stated:

> Exempt staff are paid a salary for the job for which they were hired. The actual hours an exempt staff member works to complete the job for which they were hired are not recorded. If the work load for an exempt staff member goes above 40 hours in a week, that person does not receive additional compensation. If the work load for an exempt staff member requires only 30 hours to complete, the exempt staff person still gets paid their full salary.

Riverside also had two policies relevant to Riverside's ability to determine an individual's schedule. "Riverside may vary work schedules for employees based on staffing needs and operational demands," and "[w]ork schedules for employees vary throughout our organization. Supervisors will advise employees of their individual work schedules."

The first policy seems to indicate that Ridings could have worked only thirty hours per week, and Ridings claims that she was working at least thirty hours per week. This policy does not assist Ridings in asserting a claim for FMLA interference because, as explained above, she would have been fulfilling the essential functions of her position

if she was working a full schedule. Because Hansen insisted that she needed to work a full schedule on the premises, she may have been entitled to take FMLA leave. However, the failure to turn in the forms forecloses Ridings's ability to persevere on an FMLA interference claim because she did not fulfill her obligations in order to be protected.

## B.  FMLA Retaliation

Ridings also asserted a claim against Riverside for retaliation in violation of the FMLA. The FMLA provides that it is unlawful for any person to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. 29 U.S.C. § 2615. In asserting a charge of retaliation under the FMLA, a plaintiff may proceed under the direct or indirect methods of proof. *Burnett*, 472 F.3d at 481.

Under the direct method, a plaintiff must present evidence that her employer took a materially adverse action against her on account of her protected activity. *Id.* A plaintiff can prevail under the direct method by showing an admission of discrimination or by "constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Phelan v. Cook County*, 463 F.3d 773, 779 (7th Cir. 2006) (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)). If the plaintiff's evidence is thereafter contradicted,

> the case must be tried unless the defendant presents unrebutted evidence that he would have taken the

adverse employment action against the plaintiff even if he had had no retaliatory motive; in that event the defendant is entitled to summary judgment because he has shown that the plaintiff wasn't harmed by retaliation.

*Burnett*, 472 F.3d at 481 (citing *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002)). On appeal, Ridings asserts a claim of retaliation only under the direct method. She argues that Riverside took a materially adverse action when it terminated her for her protected activity, working a reduced schedule. Ridings describes several occurrences from which she contends that a jury could infer intentional discrimination.

Several of Ridings's pieces of circumstantial evidence relate to Riverside's motive for objecting to her reduced schedule. Ridings cites that she received a favorable work evaluation in June 2003 and Riverside could not identify any complaints about the "quality, quantity, or timeliness" of her work during the time period of her reduced schedule. She also states that Hansen did not begin objecting to her shortened schedule until she had finished the large payroll protect in January 2004. She contends that there was no "business justification" for needing her to work an eight-hour day or to work her full schedule on the premises. Riverside acknowledges that it did not terminate Ridings because of poor work quality. However, this does not lead to an inference that Ridings's termination was retaliatory. Riverside was entitled to ask Ridings to work a full schedule on the premises because she was a full-time employee; an employee cannot simply inform the employer when and from where she would like to work.

Ridings cites to *Washington v. Illinois Department of Revenue*, 420 F.3d 658 (7th Cir. 2005), in which an employee worked an earlier flex-time shift in order to care for her son, who had Down Syndrome, each afternoon. The employee filed a charge of race discrimination against the employer, for reasons unrelated to her schedule, and her position was later eliminated. She was required to move to a new position and re-apply for flex-time, but the flex-time request was refused. We held that a jury could infer discrimination, in that her employer had "set out to exploit a known vulnerability" by requiring her to work a later schedule. *Id.* at 663. Ridings implies that her situation is comparable, in that Riverside was asking her to do something that it knew she could not do, work eight hours on the premises. The employee in *Washington* requested permission for a different schedule; she did not contend that she was entitled to leave early or to work from home. Ridings insisted throughout her deposition that she did not need to be on leave. She asserts that Riverside knew that she was working from home, but she does not contend that she had ever requested or been granted permission to work part of her schedule from home. Riverside gave Ridings an alternative—she could either work a full schedule on the premises or fill out FMLA paperwork, but Ridings admitted that she did not begin to work an eight-hour day on the premises and that she "refused to apply for FMLA leave and declined to provide the requested medical certification."

Ridings also contends that a jury might infer that the request to provide "some type of documentation" of her medical condition was an intentionally vague "set-up," so

that Riverside could later claim that the information she provided was insufficient. Ridings also argues that the manner in which Riverside requested the FMLA paperwork and the decision to terminate her would allow a jury to infer retaliation. Although Riverside's initial request for documentation may not have been ideal, Riverside gave her the FMLA forms she needed and more time than the FMLA required to fill them out. Riverside was permitted by the FMLA to require Ridings to substantiate her continued need for a reduced schedule, and it terminated her in accordance with the FMLA and its employment policies, after giving her repeated opportunities to provide the information it had requested. An employer cannot be deemed to retaliate against an employee by asking her to fulfill her obligations under the FMLA.

## C. Workers' Compensation Retaliation

Ridings asserted that Riverside also retaliated against her in violation of the Illinois Workers' Compensation Act. The district court had discretionary authority to consider this claim under its supplemental jurisdiction. *See* 28 U.S.C. § 1367(a). Generally, when a court resolves all federal claims before trial, it should dismiss supplemental claims without prejudice. *Redwood v. Dobson*, 476 F.3d 462, 467 (7th Cir. 2007). However, the court was not required to dismiss the state law claim, and neither party objected to its continued exercise of supplemental jurisdiction. *See Jones v. Patrick & Assocs. Detective Agency*, 442 F.3d 533, 535 n.1 (7th Cir. 2006) (considering a state-law claim on appeal where the district court elected to retain its supplemental jurisdiction).

To prevail on a claim for retaliatory discharge under the Illinois Workers' Compensation Act, Ridings must allege that (1) she was an employee of Riverside before or at the time of the injury; (2) she exercised a right granted by the Act; and (3) her discharge was causally related to the exercise of that right under the Act. *Clemons v. Mech. Devices Co.*, 704 N.E.2d 403, 406 (Ill. 1998). If Riverside can demonstrate a valid basis for discharging Ridings that is not pretextual, the element of causation is not met. *See id.*

Ridings has clearly met the first two elements; she was an employee of Riverside when she was diagnosed with Graves' disease in December 2002, and she filed a claim under the Workers' Compensation Act in July 2003. Ridings attempts to satisfy the third element through circumstantial evidence. First, she argues that she completed work on the payroll project for Riverside in January 2004 and, at that same time, Hansen began to ask her to work a full schedule. Second, she notes that her attorney sent a demand letter to Riverside on March 8, 2004, which was three days prior to Hansen's draft of the first CAR. Third, she notes that Hansen emailed two Riverside employees whose responsibilities included managing workers' compensation claims to inform them of Ridings's discipline relating to the FMLA forms. Finally, she recounts a remark that Hansen made in her presence about workers' compensation claims, and he looked at her and laughed. Ridings claims that these events demonstrate that Riverside's reasons for terminating her were pretextual.

Ridings's first piece of circumstantial evidence is that she started a major project for Riverside around the same time

period that she filed the workers' compensation claim, and as soon as she completed the protect Riverside began to require her to work a full schedule. Ridings suggests that Riverside was waiting to retaliate against her until she had completed the project. Ridings cites *Pryor v. Seyfarth, Shaw, Fairweather & Geraldson*, 212 F.3d 976, 980 (7th Cir. 2000), in which we found that "[a] reasonable jury could find that after and because [the employee] filed a [sexual harassment] claim, the firm was 'laying' for her, biding its time to create a space between the date of the claim and the date of the discharge, and in the interval gathering pretextual evidence of misconduct to provide a figleaf for its retaliatory action." Ridings suggests that there is sufficient evidence to show that Riverside was similarly "biding its time" before it terminated her. In *Pryor*, the employee was terminated for applying an artificial fingernail to a visitor in the restroom while she was on break. The incident occurred three months after the employee filed a sexual harassment claim. The employer asserted that the employee was terminated because of the fingernail incident and because she had a history of unsatisfactory work and wearing inappropriate attire to work. The evidence did not support the contention that her work was poorly performed, and the evidence conflicted as to the employer's problems with her attire; therefore, we found that there was sufficient evidence of retaliation to survive summary judgment. *Id.* Here, there is no such evidence of pretext. Riverside admitted that Ridings was not terminated for poor work performance. The evidence shows that Ridings was terminated for failure to turn in FMLA paperwork, and Riverside was lawfully entitled to ask her to fill out

FMLA paperwork. Ridings does not suggest or provide evidence that, if she had complied with the request to turn in FMLA paperwork, Riverside would have created alternate reasons to terminate her. We conclude that the evidence does not support Ridings's contention that Riverside waited for six months after she filed the claim and began retaliating against her by requesting that she work a full schedule or take FMLA leave.

Ridings's second piece of circumstantial evidence is that her attorney sent Riverside a demand letter on March 8, 2004, and Hansen began drafting the first CAR on March 11, 2004. Riverside contends that Ridings did not prove that any decisionmaker knew of the demand letter. However, Ridings did not need to prove that Hansen or another decisionmaker actually knew of her claim; a reasonable inference is enough, and an adverse employment action "on the heels of the protected activity" is circumstantial evidence of a decisionmaker's knowledge and retaliation. *Scott v. Sunrise Healthcare Corp.*, 195 F.3d 938, 941 (7th Cir. 1999). However, the significance of the timing of this evidence is undercut by the fact that Hansen began the disciplinary process before the demand letter was sent; he informed Ridings that she needed to begin working a full schedule on January 25 and February 25, 2004, several weeks prior to the demand letter being sent. Ridings observed that the "formal" disciplinary process started three days after the demand letter was sent, even if the "informal" process had already begun. However, employers commonly use a formal disciplinary process after an informal process has failed to achieve the desired results. Ridings admittedly did not begin working a full day after

Hansen informally talked to her twice, and so we conclude that Hansen's implementation of a "formal" process in approximately the same time period as Riverside received her demand letter is not indicative of retaliation.

Ridings's third piece of circumstantial evidence is that Hansen sent an email to two Riverside employees who worked in the Risk Services Department about Ridings's discipline. The two employees were not involved in disciplining employees but were involved in managing workers' compensation claims. She notes that one of those employees also had a conversation about Ridings's workers' compensation claim with Hansen. If the email or conversations had yielded evidence of retaliation, then summary judgment would be inappropriate. Here, the email was simply an interdepartmental message from Ridings's supervisor that informed two employees who managed her workers' compensation claim that she was being disciplined for failure to turn in FMLA leave forms. Hansen testified in his deposition that he sent the message because Ridings had presented him with her attorney's business card, and so he felt that it would be prudent to inform the Risk Services employees who were involved with Ridings's claim. The conversation between the Risk Services employee and Hansen about Ridings's claim also did not yield any retaliatory evidence. The mere fact that a Risk Services employee discussed the workers' compensation claim with Ridings's supervisor does not create an inference of retaliation.

Finally, Ridings describes a remark that Hansen made in her presence, in which he stated to another employee who

was climbing on a table to change the time on the clock, "Watch out, we don't want a workers' comp claim." Hansen then looked at Ridings and laughed. Ridings believes this event occurred sometime during April 2004, which would have been during the time period of the disciplinary process that led up to Ridings's termination. This piece of evidence is a closer call. Isolated, "stray workplace remarks" are sometimes insufficient to defeat summary judgment. *Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1293 (7th Cir. 1997). Where a decisionmaker, or a person who provided input into the decision, expressed feelings around the time of, and in reference to, the adverse employment action complained of, then it "may be possible to infer that the decision makers were influenced by those feelings in making their decision." *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 653 (7th Cir. 2000). Hansen was admittedly a decisionmaker in Ridings's termination. Hansen's comment was proximate in time to Ridings's termination, as it occurred sometime during the month prior to her termination. The comment suggested that Hansen was aware of Ridings's workers' compensation claim, but his comment was not made in reference to an adverse employment action. We conclude that the remark was isolated and insufficient for us to infer that the decision to terminate Ridings was related to her filing of a workers' compensation claim. *See Bahl*, 115 F.3d at 1293 (finding that a decisionmaker's derogatory comments about his inability to understand an employee due to the employee's accent were insufficient to defeat summary judgment because they were not linked to the decision to terminate the employee); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1140

(7th Cir. 2000) (finding that a decisionmaker's isolated comment that the employee was too old to train for another position was insufficient to defeat summary judgment because the employee did not show "that age actually played a role in the defendant's decisionmaking process and had a determinate influence on the outcome"). *But see Hunt*, 219 F.3d at 652 (finding that summary judgment was not appropriate where a decisionmaker made repeated racist and ageist remarks, the decisionmaker had the power to recommend denying raises for the employees, and the employees did not receive raises until after the lawsuit was initiated). Riverside has articulated a valid basis for terminating Ridings, and we find that Ridings has failed to demonstrate sufficient evidence to show that Riverside's stated reason for the termination was pretext. Therefore, Ridings cannot succeed on this claim.

### III.  Conclusion

We conclude that Riverside is entitled to summary judgment on all three claims, and, therefore, we AFFIRM the district court's decision.